SHARON ALDOUPOLIS, administratrix,[1] *vs.* THE GLOBE
NEWSPAPER COMPANY & another.[2]

Suffolk.    October 8, 1986. — December 3, 1986.

Present: HENNESSEY, C.J., LIACOS, NOLAN, & LYNCH, JJ.

*Libel and Slander. Practice, Civil,* Summary judgment.

Taken in context, an allegedly defamatory statement in an article on the
"op-ed" page of a newspaper about a certain notorious criminal case,
was, as matter of law, a constitutionally protected statement of opinion,
especially since the author clearly stated the facts and the result of the
criminal case without implying undisclosed, defamatory facts. [734-735]

CIVIL ACTION commenced in the Superior Court Department
on August 30, 1983.

Motions for summary judgment were heard by *B. Joseph
Fitzsimmons,* J.

Leave to take an interlocutory appeal was granted in the
Appeals Court by *Joseph P. Warner,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*S. Elaine McChesney (Carol J. Paquin* with her) for the
defendants.

*Stephen Hrones* for the plaintiff.

NOLAN, J. The defendants, The Globe Newspaper Company
and Ellen Goodman, appeal from the denial of their motion
for summary judgment in a defamation action brought by

___

[1] Of the estate of Alexander Aldoupolis. The action was commenced by
Alexander Aldoupolis in August, 1983. A suggestion of death of the plaintiff
was filed on November 15, 1984. The administratrix filed a motion to
substitute plaintiff on March 21, 1985.

We do not reach the issue of the survival of an action for defamation
because we reverse on other grounds.

[2] Ellen Goodman.

Alexander Aldoupolis. Aldoupolis claimed that he was defamed by a column written by Goodman and published in the Boston Globe on July 26, 1983. We reverse and order judgment to be entered for the defendants. The facts can be summarized as follows.

About six weeks prior to the publication of Goodman's column entitled, "There's a moral in the case of the beaten-up car," Aldoupolis and four other defendants were acquitted of rape charges. The criminal trial was popularly referred to as the "Holbrook Five" rape case, and Goodman's column was a commentary about the outcome of the criminal trial. The criminal charges were initially brought against Aldoupolis and the others because of an incident which took place on January 23, 1980. See *Aldoupolis* v. *Commonwealth,* 386 Mass. 260, cert. denied sub nom. *Savoy* v. *Massachusetts,* 459 U.S. 864 (1982). Aldoupolis and several friends met a woman in a bar and accompanied her to a wooded area in Holbrook. Aldoupolis admitted having sexual relations with the woman, but he claimed that the woman had consented. At the trial, the complaining witness (victim) did not testify, and the two issues which arose were the victim's consent and the credibility of the Commonwealth's chief witness, a participant in the incident who had been granted immunity. Ultimately, Aldoupolis and the other defendants were acquitted of the rape charges, but were found guilty of malicious destruction of property for damaging the victim's car.[3] About six weeks later, Goodman's column appeared in the Boston Globe on the page opposite the editorial page, commonly called the "op-ed" page.[4] The following portion of the article is challenged by Aldoupolis as being defamatory: "What is agreed upon by everyone is that the men took turns. While one was jumping her, the others were jumping on her car."

---

[3] On appeal by three of the five defendants, it was held that the evidence was insufficient to warrant a conviction based either on their own acts or on a joint venture theory. See *Commonwealth* v. *Savoy,* 21 Mass. App. Ct. 519 (1986).

[4] The entire column can be found in the Appendix to this opinion.

A motion for summary judgment is particularly appropriate in defamation cases because if the allegedly libelous material is not actionably defamatory, there is no genuine issue of material fact for trial. *Godbout* v. *Cousens,* 396 Mass. 254, 258 (1985). See Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974).

We begin by noting that statements of pure opinion as distinguished from mixed opinion are protected by the First Amendment to the United States Constitution and are, therefore, not actionable in a defamation suit. *Pritsker* v. *Brudnoy,* 389 Mass. 776, 778 (1983). The reason for this protection is that, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 339-340 (1974). In accord with *Gertz,* several of our recent opinions have found statements which were challenged as defamatory to be nonactionable statements of opinion. See, e.g., *Myers* v. *Boston Magazine Co.,* 380 Mass. 336, 341 (1980) (statement in a satirical magazine article that a sports announcer was "enrolled in a course for remedial speaking" [he was *not* so enrolled] was opinion); *Cole* v. *Westinghouse Broadcasting Co.,* 386 Mass. 303, 305-306 (1982) ("sloppy and irresponsible reporting" and "history of bad reporting techniques" were statements of opinion). Similarly, statements that plaintiff restaurant owners were "pigs" and that a State trooper who stopped a radio commentator for a traffic violation was a "dictator" were held to be nonactionable statements of opinion. *Pritsker* v. *Brudnoy, supra* at 782. *Fleming* v. *Benzaquin,* 390 Mass. 175, 183 (1983). Thus, if Goodman's statement that Aldoupolis took a turn "jumping" the woman is an opinion, the suit must be dismissed. In passing, it may be noted that nowhere in the column does Aldoupolis's name appear, or the names of the other defendants or the name by which the group was known in the newspaper reports of the case, the "Holbrook Five."

The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion. *Myers, supra* at 339. However, if a statement is susceptible of being read by a

reasonable person as either a factual statement or an opinion, it is for the jury to determine. *Id.* at 339-340. In resolving whether the statement constitutes an opinion or an assertion of fact as a matter of law, the court must "examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." *Id.* at 341-342, quoting *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980).

In applying this test, we conclude that the statement challenged by the plaintiff cannot reasonably be read as anything but a statement of opinion. The plaintiff urges us to focus on the two sentences at the beginning of the fifth paragraph of Goodman's column. However, we review the statement in its totality and in the context in which it was uttered or published. Read in context, the challenged statement is part of an opinion by Goodman that the judicial system treats automobiles better than it does women. This is evident from the comparison of an automobile and a woman which Goodman makes throughout the column. She uses the rhetorical device of personification to make an automobile a person and by an adroit cadence of parallel sentences compares the favorable treatment of a motor vehicle to the shabby treatment of women in rape cases. We must also consider cautionary terms used in a challenged statement, and here Goodman clearly stated that the plaintiff was found "innocent of damaging the woman." Finally, we must consider the medium by which the challenged statement is disseminated and the audience to which it is published. This inquiry confirms our conclusion that Goodman's column was a statement of opinion. The statement was disseminated to its readers on the op-ed page of the Boston Globe. The op-ed page consists of signed columns by a host of writers who express their opinions on a variety of topics. Moreover, readers

of the op-ed page no doubt expect to read columnists' views and opinions as opposed to factual news stories. Although the appearance of the column on the op-ed page, without more, is not at all dispositive, it is nevertheless some indication that the statements made in the column are opinions. See *Loeb* v. *Globe Newspaper Co.*, 489 F. Supp. 481, 483, 486 (D. Mass. 1980) (defendant entitled to summary judgment because statements were opinions).

More to the point is the absence of undisclosed, defamatory facts. Goodman recited the facts and the result of the criminal cases and left the reader in no position to draw inferences as to undisclosed, defamatory facts. See *Fleming* v. *Benzaquin, supra* at 187; Restatement (Second) of Torts § 566 (1977). Thus, the statements challenged by the plaintiff are constitutionally protected statements of opinion.

In sum, Goodman exercised that precious privilege "to speak her mind" about the judicial system. One need not agree with all that she wrote to acknowledge her fundamental right to express her disdain for the operation of our judicial system. May the day not dawn when such opinion is suppressed.

*Judgment reversed.*

*Judgment for the defendants.*

APPENDIX.

THERE'S A MORAL IN THE CASE OF THE BEATEN-UP CAR

Ellen Goodman

At last, the sweet smell of justice.

After 3½ years, the five young men who once upon a time pleaded guilty to the gang-rape of a 39-year-old woman in Holbrook were finally punished for a crime. Last Wednesday they were handed a two-year suspended sentence and ordered to pay damages for assaulting the woman's car.

How, you may ask, are these men finally brought down by the harsh hammer of justice? For those who have forgotten the details of this nationally publicized case, a brief chronology:

On Jan. 23, 1980, a group of young men met the woman in a bar. This woman, forever after referred to as "a former beauty queen," went with them to a nearby wooded area. So did her car. There, five of the men maintained that she offered to have sex with them all for $200 and she maintained that they raped her.

What is agreed upon by everyone is that the men took turns. While one was jumping her, the others were jumping on her car. At the end, the bruised auto was rolled over an embankment. The bruised woman was left naked in the January night.

A sixth man, who later testified against his friends, may have saved the woman's life by returning to the scene and driving the woman to a nearby fire station.

On Oct. 5, 1981, in a plea bargain, the five men agreed to plead guilty to rape. In return, the judge — who called this "a consensual sexual adventure that went off track" — gave them a suspended sentence and $500 fines to be paid in $5 weekly installments. Four days of public outrage later, the judge revoked the suspended sentences, ordered their guilty pleas withdrawn and ordered the case to trial.

After many legal machinations that included one trip in the US Supreme Court and another to the Massachusetts Supreme Court, and a mistrial, the quintet went to trial in April 1983. This time they pleaded innocent to rape and to malicious damage to the woman's personal property.

On June 17, they were found innocent of damaging the woman but — hosanna and pass the scales of justice — guilty of damaging the car. Last week, they found out that crime doesn't pay.

Well, what have we learned from the successful prosecution of the gang bang-up of a car? That it's easier to convict men of battering a chassis if the chassis is made of tin?

There are several things to be considered by the legal profession, especially by those who have the misfortune to be on the side of a woman in a rape case. Here is one of them: it is better to have a car as a client than a woman.

This car, unlike this woman, was not penalized for being unable to testify at the trial. Nor did anyone in the courtroom bring up the automobile's private history or reputation, although it is suspected that the car had once received bruises for which it was at fault. There are even rumors that the car once plunged willfully into a fender-bender.

In addition, cars cannot be judged harshly for frequenting a bar, although occasionally they guzzle gas. A car is rarely remembered as "a former beauty queen," even though it may once have been the star of a local showroom somewhere.

Moreover, jurors do not generally care about the appearance of automobiles: What was the color of the seat covers? Was it wearing a see-through sun roof? Was it a racy foreign number? It is rare that a Mercedes 450SL is suspected of enticing vandals.

It should also be noted that this particular car was a perfect client because it had been totalled. Who could dispute that it was the victim? There was the dead body. It would have been neater, legally speaking, if the woman in this case had not been rescued, but had been a frozen stiff.

What is the moral to this tale of the Banged-up Car? Sex muddies the legal water. If five men had done nothing more than leave a bruised and naked woman alone in the middle of the January night, I'm convinced they would have received sterner punishment.

Stay tuned until next October, when the famous New Bedford rape case goes on trial. They'll probably get the guys for ruining the felt on the pool table.