EDWARD J. KING *vs.* THE GLOBE NEWSPAPER COMPANY
& others.[1]

Suffolk. February 5, 1987. — August 17, 1987.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Practice, Civil*, Summary judgment. *Libel and Slander.*

Discussion of the propriety of a judge's considering and allowing a motion for summary judgment after another judge in the same court had denied it. [707-708]

Discussion of the distinction in the law of defamation between statements of opinion and statements of fact. [708-710]

In a civil action by a former public official against an artist and a newspaper for libel in the publication on the editorial page of three allegedly defamatory cartoons, the judge correctly ruled, in granting the defendants' motions for summary judgment, that the cartoons were expressions of opinion protected by the First Amendment to the Constitution of the United States. [710-713]

NOLAN, J., concurring in part and dissenting in part, was of opinion that summary judgment should not have been granted with respect to one of the three cartoons. [735-736]

A certain cartoon published on the editorial page of a newspaper was not actionable as libelous on the theory that it implied the existence of undisclosed defamatory facts, where the statement of opinion the cartoon conveyed was clearly based on uncontested facts published in the same newspaper the previous day. [713]

In a civil action by a former public official against a newspaper for libel in the publication of an allegedly defamatory editorial, the judge correctly granted the defendant's motion for summary judgment where the editorial, which simply posed questions and suggested answers about the way public business was being conducted, was a statement of opinion protected by the First Amendment. [713-714]

In a civil action by a former public official against a newspaper and a columnist for libel in the publication of an allegedly defamatory column on the "op-ed" page of the newspaper, the judge correctly granted the defendants' motions for summary judgment where a reasonable reader could only have understood the column as the writer's own satirical commentary on the plaintiff and his administration. [714-715]

[1] Robert L. Turner, David Farrell, and Paul Szep.

In a civil action by a former public official against a newspaper and a writer for libel in the publication of an allegedly defamatory article, the judge correctly concluded, in granting the defendants' motion for summary judgment, that, where the article suggested certain actions of the plaintiff were motivated by loyalty to an associate rather than concern for the public good, but made no implication of corruption, it was opinion protected by the First Amendment. [715-716]

The judge hearing motions for summary judgment in a libel case correctly ruled that a statement published in a newspaper article that the plaintiff, a former public official, "called a judge and demanded that he change a decision he had rendered in a gang-rape case" was unambiguously a statement of fact [716-717], but he erred in granting summary judgment for the defendants where there was a question for a jury to resolve whether those words were susceptible of defamatory meaning [717-719].

Discussion of "reckless disregard" for the truth constituting "actual malice" in the publication of a defamatory statement. [719-720]

Summary judgment in favor of a newspaper that had published a false statement of fact about a public official was not appropriate where the material before the motion judge would have warranted a jury in finding, on clear and convincing evidence, that the statement was published with reckless disregard for its falsity thus sustaining the plaintiff's burden of proving the "actual malice" necessary for him to prevail. [720-722]

CIVIL ACTION commenced in the Superior Court Department on January 4, 1982.

The case was heard by *James P. Lynch, Jr.*, J., on a motion for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Robert H. Goldman (Alan M. Cohen* with him) for the plaintiff.

*Joseph L. Kociubes (Robin A. Driskel & Don E. Gorton, III*, with him) for the defendants.

O'CONNOR, J. This is a libel action brought by former Governor of the Commonwealth Edward J. King against The Globe Newspaper Company, publisher of The Boston Globe and The Boston Sunday Globe (Globe), two Globe columnists, David Farrell and Robert L. Turner, and a Globe cartoonist, Paul Szep. The complaint is in twelve counts. In the first two counts, the plaintiff alleges that he was libeled by an article written by the defendant Farrell and published by the Globe on

November 8, 1981. Counts 3 and 4 make the same allegations with respect to an article written by Farrell and published by the Globe on November 22, 1981. Counts 5 and 6 assert that the plaintiff was libeled by a column authored by the defendant Turner and published by the Globe on January 10, 1980. Three cartoons created by the defendant Szep and an editorial accompanying one of them, appearing on various dates in the Globe, are the focus of Counts 7 through 12.

The defendants filed a motion for summary judgment. The motion was denied by a judge in the Superior Court. More than two years later, however, another judge allowed the same motion as to all counts. The second judge ruled that the cartoons and the challenged statements in all but one of the articles were constitutionally protected expressions of opinion. He concluded that the statement in Farrell's article, published on November 8, 1981, alleged by the plaintiff to be libelous, was a statement of fact rather than opinion, but that it was neither defamatory nor malicious. To be actionable, a defamatory statement of fact about a public official must have been made with malice. *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280 (1964). The plaintiff appealed, and we granted his application for direct appellate review. We affirm the judgment as to all counts except Counts 1 and 2, the counts based on Farrell's November 8, 1981, article. We reverse the judgment as to Counts 1 and 2, and we remand the case to the Superior Court for trial on those counts.

We begin our review with a brief discussion of the propriety of a judge's having considered, and then allowed, the defendants' motion for summary judgment after another judge in the same court had denied it. "Though there is no duty to reconsider a case, an issue, or a question of fact or law, once decided, the power to do so remains in the court until final judgment . . . ." *Peterson* v. *Hopson*, 306 Mass. 597, 601 (1940). "A judge should hesitate to undo his own work. . . . Still more should he hesitate to undo the work of another judge. . . . But until final judgment . . . there is no lack of power, and occasionally the power may properly be exercised." (Citations omitted.) *Id.* at 603. See *Dolan* v. *Von Zweck*, 19 Mass. App. Ct.

1032, 1034 (1985), and cases cited. Noting his reluctance to entertain a motion on which another judge had previously ruled, the judge nevertheless concluded that this case presented "many compelling reasons . . . to take a 'fresh look' at certain of the issues raised." One of those reasons, sufficient by itself, is that summary judgment procedures are especially favored in defamation cases. *Godbout* v. *Cousens*, 396 Mass. 254, 258 (1985). "Allowing a trial to take place in a meritless case 'would put an unjustified and serious damper on freedom of expression.'" *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. 32, 37 (1985), quoting *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 233 (1979), cert. denied, 446 U.S. 935 (1980). Even if a defendant in a libel case is ultimately successful at trial, the costs of litigation may induce an unnecessary and undesirable self-censorship. See *New York Times Co.* v. *Sullivan, supra* at 279. We agree with the judge that a second look at the motion for summary judgment was appropriate. This is particularly true in light of the considerable discovery that took place following the first judge's denial of the motion.

The judge allowed the defendants' motion for summary judgment with respect to Counts 3 through 12 on the ground that the cartoons and articles which those counts addressed were constitutionally protected expressions of opinion. In his thorough and scholarly memorandum of decision, the judge focused on the critical distinction in the law of defamation between statements of opinion and statements of fact. See *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303, 308, cert. denied, 459 U.S. 1037 (1982). Statements of fact may expose their authors or publishers to liability for defamation, but statements of pure opinion cannot. Statements of pure opinion are constitutionally protected. *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 733 (1986). *Pritsker* v. *Brudnoy*, 389 Mass. 776, 778 (1983). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact."

(Footnote omitted.) *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974).

Of course, it is much easier to recognize the significance of the distinction between statements of opinion and statements of fact than it is to make the distinction in a particular case. "[I]t is hard to draw a bright line between 'fact' and 'opinion.'" *Janklow* v. *Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir.), cert. denied, 479 U.S. 883 (1986). Nevertheless, sensible lines must be drawn. "The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion." *Aldoupolis* v. *Globe Newspaper Co.*, *supra* at 733, citing *Myers* v. *Boston Magazine Co.*, 380 Mass. 336, 339 (1980). However, the determination whether a statement is a factual assertion or is a statement of pure opinion is a question of fact if the statement reasonably can be understood both ways. See *Aldoupolis, supra; Myers, supra* at 339-340. Therefore, in an action of libel, the defendant is entitled to summary judgment if the challenged statement cannot reasonably be construed as a statement of fact.

Numerous cases decided by this court and others have identified factors that tend to show whether a particular statement is one of fact or of opinion. We shall discuss some of these factors in connection with our individual treatment of the cartoons and articles in issue in this case. We note at this point, however, that the purpose for which the distinction between fact and opinion is made is of paramount importance in making the distinction. Thus, the distinction between fact and opinion in a libel case involving a public figure, as here, must reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan, supra* at 270. Of course, the distinction must also reflect our concern for the legitimate rights of individuals to reputations unsullied by defamatory remarks. We must strive for an appropriate balance between those competing values. *Stone* v. *Essex County Newspapers,*

*Inc.*, 367 Mass. 849, 855 (1975). *Ollman* v. *Evans*, 750 F.2d 970, 974 (D.C. Cir. 1984), cert. denied, 471 U.S. 1127 (1985). Thus, while in a criminal case the motive or intent of the defendant in performing an act is ordinarily treated as a question of fact, in a libel action a statement about a public official's motive or intent is ordinarily treated as a statement of opinion. *Janklow* v. *Newsweek, Inc., supra* at 1302, 1305.

We turn now to the specific cartoons and articles alleged to be libelous. On May 12, 1981, the Globe published a Szep cartoon, depicting the plaintiff attired in a striped suit, a black shirt, and a white necktie on which the words "Can Do" appear. The plaintiff is holding a hat with an attached pinwheel, and he is handcuffed to a police officer who is reading to another officer seated at a desk an apparent list of the plaintiff's appointees. The following words appear beneath the cartoon: "the appointment and forced resignation of Stephen Guptill, the appointment and forced resignation of Stephen Clifford, the appointment and forced resignation of Thomas DiSilva, the appointment and forced resignation of John Haggerty, the appointment and forced resignation of Barry Locke . . . ." A copy of this cartoon appears as Appendix A to this opinion. In determining whether a statement can reasonably be construed as a statement of fact, it is appropriate to consider "the medium by which the statement is disseminated." *Cole* v. *Westinghouse Broadcasting Co., supra* at 309, quoting *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980). "Cartoons are seldom vehicles by which facts are reported; quite the contrary, they are deliberate departures from reality designed forcefully, and sometimes viciously, to express opinion." *Keller* v. *Miami Herald Publishing Co.*, 778 F.2d 711, 718 (11th Cir. 1985). Reasonable readers are well aware that "[c]artoonists employ hyperbole, exaggeration, and caricature to communicate their messages . . . ." *Id.* at 716. See also *Yorty* v. *Chandler*, 13 Cal. App. 3d 467, 471-472, 474 (1970).

The plaintiff contends that the "appointments" cartoon makes a statement that he appointed individuals to government positions whom he knew at the time of appointment to have engaged

in unethical or criminal conduct, and that the plaintiff had a criminally culpable state of mind. However, we agree with the judge that the cartoon unambiguously is a statement of the cartoonist's opinion, expressed by the use of "artistic rhetorical hyperbole," that the plaintiff was responsible for several ill-advised appointments. As the judge observed, it would be unreasonable to interpret that cartoon as a disclosure that "the plaintiff had been arrested, handcuffed, and charged, or was a criminal, or knew of criminal or unethical conduct of his appointees before their selection."

Another Szep cartoon, published November 9, 1979, is entitled "King Signs School Prayer Bill," and depicts the plaintiff at a desk signing a piece of paper, presumably the school prayer bill. He is flanked on one side by a person named "Patronage" and on the other side by a person named "Cronyism." "Patronage" carries in his pocket a satchel labeled "Pay Raise," and "Cronyism" holds the plaintiff's arm as the plaintiff signs the paper. Packets of money are on the desk in front of "Cronyism." The caption to the cartoon is "So Let Us Prey!" A copy of the cartoon appears at the end of this opinion as Appendix B.

As we observed in connection with the "appointments" cartoon, cartoons are seldom designed to disclose facts, but rather are ordinarily understood by reasonable viewers to be rhetorical, exaggerated means of expressing opinions. The plaintiff argues in reference to the "School Prayer Bill" cartoon that "an inference exists that the packets of money on the table that 'Cronyism' is holding relate not to the Pay Raise Bill but to monetary payments Plaintiff allegedly received or was to receive for signing the School Prayer Bill. The linked arms of 'Cronyism' and Plaintiff can only indicate a direct or indirect correlation between the money on the table and Plaintiff's signing of the School Prayer Bill. The 'So Let Us Prey!' caption clearly implies that Plaintiff was preying on the public by enacting legislation in exchange for monetary compensation." We are not persuaded by the plaintiff's argument. In our view, the interpretation of the cartoon advanced by the plaintiff is unreasonably strained. Statements alleged to be libelous must

be interpreted reasonably. *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 60 (1983). The cartoon in question cannot reasonably be construed as representing as a fact that the plaintiff had been guilty of extortion or had accepted a bribe to sign the school prayer bill. At the most, the cartoon may suggest that the plaintiff was motivated to sign the school prayer bill by his interest in attracting legislative support for the pay raise bill, which, in the cartoonist's view, constituted preying on the public. But, the First Amendment protects the questioning and impugning of the motives of public officials. See *Janklow* v. *Newsweek, Inc., supra* at 1305 ("It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials").

The final cartoon of which the plaintiff complains was a Szep cartoon published by the Globe on October 18, 1979. On the previous day, the Globe had published an article prepared by its Spotlight Team of investigative reporters detailing efforts by Secretary of Transportation Barry Locke to protect and preserve certain billboards slated for removal. The article, not challenged here, also reported that industry officials, friends, and relatives had contributed to the plaintiff's 1978 gubernatorial election campaign. On October 18, the Szep cartoon was published alongside an editorial. The editorial expressly relied on and drew from the article of the previous day. The cartoon depicts a billboard on which caricatures of the plaintiff and Locke, holding bags of money, appear. At the base of the billboard is the name "Ackerley," and the billboard says, "Ackerley billboards can put money in your pockets too!" Copies of this cartoon and the accompanying editorial appear as Appendices C and D to this opinion. The editorial suggests that the resurgence of the billboard industry was due to the fact that "industry money finally reached what must be the right places." The editorial asserts that persons associated with "Ackerley Communications, one of the nation's largest billboard firms . . . dropped $7000 into [the plaintiff's] campaign treasury" and that, subsequently, the plaintiff's administration took several actions favorable to the billboard industry.

The billboard cartoon must be viewed as a protected expression of opinion. We do not agree with the plaintiff that the cartoon depicts him "accepting cash bribes . . . in return for his support of the efforts of Ackerley Communications." Rather, we agree with the judge that "[t]he alleged facts figuratively conveyed by the cartoon (that the plaintiff and Locke received personal cash contributions and/or payoffs from Ackerley) simply do not flow from a form of expression that clearly draws upon overstatement and extravagant symbolism to make its point. The cartoon implies nothing more than Szep's editorial judgment that the plaintiff's association with Ackerley raised questions of public concern."

A statement cast in the form of an opinion may imply the existence of undisclosed defamatory facts on which the opinion purports to be based, and thus may be actionable. See *Aldoupolis* v. *Globe Newspaper Co., supra* at 735; *Fleming* v. *Benzaquin*, 390 Mass. 175, 187 (1983); *Cole* v. *Westinghouse Broadcasting Co., supra* at 312-313; *Myers* v. *Boston Magazine Co., supra* at 338-339; *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp., supra* at 227-228; Restatement (Second) of Torts § 566 (1977). But, the billboard cartoon does not imply the existence of undisclosed facts. On the contrary, the cartoon was clearly based on the facts disclosed in the report that had been published the previous day, which are not contested here.

The statements contained in the editorial accompanying the billboard cartoon also fall within the ambit of protected opinion. The primary theme of the editorial is a condemnation of the billboard industry's actions, objectives, and lobbying practices. The plaintiff focuses especially on the statement appearing in the editorial's fourth paragraph that says that "apparently . . . industry money finally reached what must be the right places." The plaintiff contends that the editorial accuses him of corruptly furthering the industry's interests in exchange for campaign contributions. The word "apparently" makes clear that the author of the statement is indulging in speculation, or at most, deduction. Moreover, the editorial spells out the reasons why that deduction was made: (1) money associated with the

billboard industry was contributed to the plaintiff's gubernatorial campaign, and (2) public opinion and the public interest were opposed to favorable treatment for the industry, so some other reason for its resurgence must be supposed. The editorial simply posed questions and suggested answers, as a matter of opinion, about the way public business was being conducted. The First Amendment protects such discussion.

On January 10, 1980, the Globe published on its op-ed page a column authored by the defendant Robert L. Turner. A copy of the column appears as Appendix E following this opinion. The entire column, labeled "Political Circuit By Robert L. Turner," consists of a fictitious press release purporting to have been issued by the plaintiff. It introduces the release with the words, "Following is a statement from Gov. Edward J. King on the departure of his press secretary, Ronald C. Brinn." Construed literally, the "Press Release" column falsely attributes to the plaintiff various statements which may have discredited him. Such false attribution can be defamatory. See *Schrottman* v. *Barnicle*, 386 Mass. 627, 641 (1982). However, just as we held in *Myers* v. *Boston Magazine Co.*, 380 Mass. 336 (1980), that, read in context, the statement that a sportscaster "is enrolled in a course for remedial speaking" could not reasonably be interpreted in a literal sense, so too, a literal construction of the "press release" as originating with the plaintiff would have been unreasonable. A reasonable reader could only have understood the column as Turner's own commentary on the plaintiff and his administration.

Reasonable readers "expect to read columnists' views and opinions as opposed to factual news stories" on an op-ed page. *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 735 (1986). Furthermore, the entire column, appearing above Turner's name, consisted of the fictitious press release. Clearly, Turner was employing the plaintiff's "voice" as a device to convey his own ideas. It might have been different if the column presented the press release and then proceeded to analyze and comment on it. Also, as in *Myers, supra* at 342, the "press release" contains numerous obvious attempts at humor, which one would not expect to find in an authentic

press release. The release purports to concern the departure of the plaintiff's press secretary. It begins with the words, "Good riddance," and proceeds to blame on the press secretary mishaps and misunderstandings that Turner obviously believed to be flaws in the plaintiff's performance. The press secretary is referred to as "the hard-boiled grinch who told me to cut off funds to the Pine Street Inn a week before Christmas." The release also declares in obvious tongue-in-cheek fashion that, if the press secretary was poorly informed about the plaintiff's administration, it was not the plaintiff's fault because the plaintiff "told him to read the papers. Somebody in this administration ought to read the papers." The column concludes with the italicized proposal, "For a recorded actuality of Gov. Edward J. King reading this press release, call 'Dial-a-Governor' — 1-800-632-8222." We are satisfied that a reasonable reader would have recognized Turner's column as satire. Contrary to the plaintiff's contention, no cautionary words to that effect were necessary. See, regarding the use of cautionary words, *Aldoupolis* v. *Globe Newspaper Co., supra.*

On November 22, 1981, the Globe published an article written by the defendant Farrell. The article is reproduced in Appendix F. The article focuses primarily on one David Thissen and his relationship with various public figures, and it discusses the fact that the plaintiff remained loyal to the controversial Thissen despite possible adverse political consequences. In the seventh of the article's seventeen paragraphs, the Farrell article states: "The governor has never run away from Thissen, even in the face of strong recommendations by Hanley et al that he would be better off putting some distance between himself and Thissen. This personal loyalty King manifests towards associates never was more apparent than during the recent infighting over a satisfactory racing bill for the industry. Despite his close association with out-of-state dog racing promoter Eddie Keelan, King has made no secret of his efforts to do Keelan's bidding on the legislation that would greatly benefit the harness track at Foxborough owned by Keelan and his partners."

There is no disagreement that the legislation to which the article refers is a racing bill which passed the Legislature in the fall of 1981, but which the plaintiff as Governor refused to sign without amendments. Also, it appears to be undisputed that the bill gave the Raynham dog track additional racing dates which competed with the schedule of Keelan's harness race track at Foxborough, and that the plaintiff predicated his approval of the bill on three amendments, one of which would have aided the track at Foxborough by preserving certain dates free of competition from the nearby Raynham and Taunton tracks.

The plaintiff's challenge to the article focuses upon the statement that he did Keelan's "bidding" in connection with the racetrack legislation. Reasonably interpreted, that statement may assert that the position the plaintiff took on that legislation was motivated by loyalty to Keelan, and perhaps by self-interest, rather than by concern for the public good. But, as the judge concluded, and as we said regarding the school prayer cartoon, *supra* at 712, the First Amendment protects as opinion discussion about the motives of public officials. The article does not imply that the plaintiff acted pursuant to a corrupt scheme to obtain personal benefits in exchange for political favors. The article suggests that the plaintiff may have been too tightly bound by personal loyalties, but it makes no implication of corruption.

Finally, we come to the Farrell article published on November 8, 1981, a copy of which appears as Appendix G herein. This article is the subject of the first two counts in the plaintiff's complaint. It is entitled "Ed King's promises not money in bank." The last two paragraphs of the article are as follows: "It has taken some political figures a long time to realize that King operates on a one-way street and regards all other state officials — duly elected constitutional officers, elected legislators, judges and other members of the judiciary — as subordinates of the executive, with their principal function to serve him, the master.

"That condescending attitude never was more in evidence than in October when King called a judge and demanded that

he change a decision he had rendered in a gang-rape case. The judge acquiesced and proved two things: 1) King's original appointment of him was a colossal blunder. 2) He is unfit to remain on the bench."

In the case to which the article referred, five men had pleaded guilty to charges of rape, unnatural rape, and malicious destruction of property, and they had been sentenced. The plaintiff publicly and repeatedly expressed his disapproval of the sentences imposed. He released copies of critical letters he had written to the Administrative Justice of the Superior Court and to the Judicial Conduct Commission. However, for purposes of the summary judgment motion the defendants concede that the plaintiff did not call the sentencing judge.

We agree with the plaintiff, as did the motion judge, that the statement that the plaintiff "called a judge and demanded that he change a decision he had rendered in a gang-rape case" was unambiguously a statement of fact. This was a statement that a specific, verifiable event had occurred. There was neither imprecision in meaning nor anything in the context of the article that suggested that the statement was not factual. Indeed, the statement, in context, functions as factual support for the author's critical characterization of the plaintiff's attitude toward other State officials. These are factors that we have previously recognized as tending to establish a statement as one of fact rather than of opinion for First Amendment purposes. See *Aldoupolis* v. *Globe Newspaper Co., supra* at 733-734; *Fleming* v. *Benzaquin*, 390 Mass. 175, 180-181 (1983); *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 60 (1983); *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 228-229 (1979). Thus, the defendants are not entitled to summary judgment on the ground that the allegedly libelous statement was a statement of constitutionally protected pure opinion.

We proceed, then, to a consideration whether, for summary judgment purposes, the statement in question was nondefamatory, as the judge concluded. "Words may be libellous unless they 'cannot be reasonably understood in a defamatory sense, or, to express it in another way, unless they are incapable of

a defamatory meaning. The test is whether, in the circumstances, the writing discredits the plaintiff in the minds of any considerable and respectable class of the community.' " *Smith* v. *Suburban Restaurants, Inc.*, 374 Mass. 528, 529 (1978), quoting *Muchnick* v. *Post Publishing Co.*, 332 Mass. 304, 305-306 (1955). "If a publication is susceptible of both defamatory and harmless meanings, it presents a question for the trier of fact and cannot be ruled non-libellous as matter of law. . . . Inferences which might be drawn by a considerable and respectable segment of the community can make a publication actionable. . . . Words may be actionable even if they do not tend to damage a plaintiff's reputation or hold him up to ridicule in the community at large or among all reasonable people; it is enough to do so among a considerable and respectable class of people." (Citations omitted.) *Id.* at 530. See also *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975).

In concluding that the challenged statement was not susceptible of defamatory meaning, the judge reasoned that *an average reader* would not "judiciously distinguish between the numerous, highly visible actions taken by the plaintiff and the single action falsely attributed to him," and that an average reader would not regard such a telephone call "to complain about an unpopular and controversial decision as reflecting disgrace upon the governor . . . especially . . . where, as here, the plaintiff vigorously undertook a public course of action for which such a call would be a logical (if unsuitable) culmination."

In our view, Farrell's statement that the plaintiff "called a judge and demanded that he change a decision he had rendered in a gang-rape case" was susceptible of a defamatory meaning. A jury would be warranted in finding that, although the general public was unhappy with the judge's decision, a considerable and respectable segment of the community would "judiciously distinguish" between the plaintiff's vigorous and public disagreement with the decision, on the one hand, and the plaintiff's attempt to interfere with the independence of the judiciary, on the other. Furthermore, in light of the fact that the independence

of the judiciary is the cornerstone of a society governed by law, it would not be unreasonable for a jury to conclude that the plaintiff would be discredited in the eyes of that same segment of the community as a result of the false disclosure that he had misused the power of his office in an attempt to pressure the judge to change his decision.

Our final inquiry with respect to Farrell's November 8, 1981, article is whether summary judgment for the defendants is nevertheless appropriate because there is no genuine issue concerning Farrell's "actual malice" in making the statement in question. The plaintiff, as a public figure, cannot recover damages without proving "actual malice." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 283 (1964). Actual malice is proved "by a showing that the defamatory falsehood was published with knowledge that it was false or reckless disregard of whether it was false." *Stone* v. *Essex County Newspapers, Inc., supra* at 867, citing *New York Times Co.* v. *Sullivan, supra* at 279-280.

In *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-323 (1986), the Supreme Court held that, under Fed. R. Civ. P. 56 (c), when a party not having the burden of proof at trial demonstrates that the party having that burden has insufficient evidence to sustain it, the moving party is entitled to summary judgment. As the Court observed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323-324. Even applying the *Celotex Corp.* standard, which we are not bound to do, we are satisfied that the material before the judge demonstrates the availability of clear and convincing evidence of Farrell's reckless disregard for the truth. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252-254 (1986); *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 231 (1979).

The test to determine "reckless disregard" is entirely subjective. *Stone* v. *Essex County Newspapers, Inc., supra* at 867. The Supreme Court has spoken of reckless disregard of the falsity of a defamatory statement as "subjective awareness of probable falsity" (*Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323,

335 n.6 [1974]); "high degree of awareness of . . . probable falsity" (*Garrison* v. *Louisiana*, 379 U.S. 64, 74 [l964]), and "awareness of probable falsity" (*Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 153 [1967]). The Supreme Court has also said that, to raise the question whether a defendant published a defamatory statement with reckless disregard for its falsity, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant* v. *Thompson*, 390 U.S. 727, 731 (1968). In *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984), the Supreme Court, citing *New York Times Co.* v. *Sullivan, supra; Gertz* v. *Robert Welch, Inc., supra,* and *St. Amant* v. *Thompson, supra,* again defined actual malice as publication despite serious doubt of the truth of the publication. See also *Herbert* v. *Lando*, 441 U.S. 153, 156 (1979), quoting *St. Amant* v. *Thompson, supra* at 731. This court, too, has quoted *St. Amant* in describing reckless disregard for truth or falsity as "serious doubts as to the truth" of the publication. See *Stone* v. *Essex County Newspapers, Inc., supra* at 867; *Twohig* v. *Boston Herald-Traveler Corp.*, 362 Mass. 807, 810 (1973). We apply that standard here.

As we observed in *Stone, supra* at 867-868, a jury may find that the author of a statement entertained serious doubts about the truth of his or her statement "on the basis of an inference drawn from objective evidence, since it would perhaps be rare for a defendant in such a circumstance to admit to having had serious, unresolved doubts." We must review, then, the materials put before the judge to determine whether, "considered with an indulgence in the plaintiff's favor," they may demonstrate to a jury to a clear and convincing degree the presence of malice on Farrell's part. *Godbout* v. *Cousens, supra* at 258-259. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255-256 (1986).

Our review focuses on the deposition testimony of Farrell and State Treasurer Robert Crane. Farrell testified that Crane was his source, and his only source, for stating that the plaintiff

had called the judge who had presided over the rape trial and demanded that the judge change his decision. Crane testified that, during a luncheon conversation, he had told Farrell that it was Crane's "understanding that the Governor was upset and called the judge, raised hell about it, said it was a lousy decision, and it should be changed." After testifying that he was unable to recall "the language [he] used to Mr. Farrell," Crane was asked, "Now, you said that you told Mr. Farrell that you had heard that Governor King had telephoned [the judge]? Did I understand you correctly?" Crane's answer was, "You did." That evidence would warrant findings that Farrell knew that Crane was not purporting to have personally witnessed the reported conversation, and that he was only repeating what he had been told. From what Crane did not say as well as from what he said, a jury also would be warranted in finding that Crane's statement to Farrell suggested that Crane's source was neither the plaintiff nor the judge.

Crane testified that, when he spoke to Farrell, Crane did not know who his informant had been, and that, at the time he testified, he did not know the informant's identity. Farrell's testimony was that he never asked Crane who Crane's informant had been, that Crane never told him, that Farrell never spoke to the judge to verify the information, and that Farrell never asked anyone else to do so. Farrell also testified that, in his thirty-five years of journalistic experience he had never heard of a similar occurrence, and that he would regard as "serious" a chief executive's demanding that a judge change a decision in a criminal case.

It would be reasonable to infer from the deposition testimony that Farrell, an experienced journalist, published as a fact that the plaintiff had engaged in conduct which, if known, would discredit him in the eyes of a considerable and respectable segment of the community, that Farrell knew that his statement was likely to have that effect, and that he knew that the conduct, if it had occurred, would have been highly unusual. Also, a jury would be warranted in finding that Farrell published the challenged statement without investigation or verification, and with the knowledge that the only information he had was hear-

say, perhaps multi-level, that Crane neither disclosed his source nor vouched for his source's reliability or for the reliability of his source's source, if there was one, and that the report to Crane was as likely to have been fabrication or speculation as to have been the truth.

The Supreme Court has said: "The defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports" (footnote omitted). *St. Amant* v. *Thompson, supra* at 732. Here, Farrell had obvious reasons to doubt the veracity and accuracy, not of Crane, but of Crane's undisclosed informant and any other informants in the chain of communication. We are satisfied that the evidence we have discussed would warrant a jury's finding of actual malice by clear and convincing evidence.

The judgment with respect to Counts 3 through 12 is affirmed. The judgment as to Counts 1 and 2 is reversed, and the case is remanded to the Superior Court for trial.

*So ordered.*

King *v.* Globe Newspaper Co.

APPENDIX A.

*". . . the appointment and forced resignation of Stephen Guptill, the appointment and forced resignation of Stephen Clifford, the apointment and forced resignation of Thomas DiSilva, the appointment and forced resignation of John Haggerty, the appointment and forced resignation of Barry Locke . . ."*

APPENDIX B.

King *v.* Globe Newspaper Co.

APPENDIX C.

APPENDIX D.

### The old billboard game

Sooner or later, there just had to be the sniff of a billboard scandal. And now there is one and it brings back those good old days when the lobbyist was king and there were always goodies for his pals in the Legislature.

During 10 years that may someday be labeled Massachusetts' "good government decade," the billboard industry has been on the run. Local communities that decided they'd been captive long enough to 672 square-foot huckstering found that state agencies and the courts were backing them up when they moved to get offending signs removed. Some legislators even discovered they could get along without a free lunch or a free billboard just before election time.

It was not that the billboard industry had folded up its barker's stand; it fought every attempt to regulate its excesses and spent a lot of money on lawyers and lobbyists. Yet, while there are still some 1000 billboards standing in violation of local, state, or federal regulations, they have been coming down from the places where people did not want them.

But now, in the space of barely a year, the tide has turned — not because people and local officials got up and objected, demanding that the billboards be put back up, but apparently, as The Globe's Spotlight Team has detailed, because industry money finally reached what must be the right places.

One year ago last August the locally-owned Donnelly Advertising Co., the state's major billboard advertising firm, was bought out for $9 million by Ackerley Communications, one of the nation's largest billboard firms. Ackerley signed up former House Speaker Robert H. Quinn to do its lobbying at the State House. Then, just before the September primary, seven of its executives (and their friends and relatives) discovered Edward J. King, at the time just an underdog candidate for governor, and dropped $7000 into his campaign treasury.

And back out of the Beacon Hill closet come all the old games. A bill zips through the Legislature and into law with King's signature to allow a ski resort billboard to remain despite a court order. King's transportation secretary and close adviser Barry Locke moves to block the removal of 95 billboards that violate the federal highway beautification law. And to top it off — for now, anyway — the administration starts talking about weakening the powers of the watchdog Outdoor Advertising Board.

Meanwhile, the industry is apparently posting or enlarging signs without permits, and providing free billboard space — either knowingly or by a very expensive oversight — to Boston mayoral candidate David Finnegan who just happens to be brother of the House Ways and Means chairman.

And why? Because billboard advertising is a big bucks industry but, curiously, an industry with not much of a constituency and, despite the piteous claims of its State House supporters, with no more than 400 employees at present, according to an industry source.

Those factors prompted the billboard industry to act as it did in the past and the way it apparently will continue to operate until it can be compelled to obey the wishes of local communities and the standards set by local, state, and federal regulations. It will be a hard game to win in a tough league, but the victory will be worth it.

APPENDIX E.

There's a new 'can-do' man in charge

NEWS RELEASE
To: The State House press
Date: Jan. 9, 1980
From: Gov. Edward J. King
Contact: Gov. Edward J. King

Following is a statement from Gov. Edward J. King on the departure of his press secretary, Ronald C. Brinn.

"Good riddance.

"With Ron Brinn out of the administration, the big roadblock is removed. Now I'll be able to get my message out to the people and pal around with reporters the way I tried to all last year. But Ron kept getting in the way.

"Clearly, I could have made the $500 million property tax rollback if Ron had only performed up to par. And talk about patronage! Ron was the one who insisted that I hire Guptill and Clifford and Haggerty and DiSilva and Foster. And now the MBTA's a big headache and Ron's no help — he's a Navy man.

"Ron, in fact, was the hard-boiled grinch who told me to cut off funds to the Pine Street Inn a week before Christmas.

"Clearly, we don't have to look very far to find out why my ratings have been plummeting in the polls. The substance has been terrific; Ron just didn't communicate the image.

"And let's not have any more talk about poor communication between Ron and me, either. It was Ron who insisted last spring that he move his offices down to the nether reaches of the State House — about three bus stops and an elevator ride from me. Ron felt he had been getting too close.

"If Ron wasn't well informed about administration activities, it's not my fault. I told him to read the papers. Somebody in this administration ought to read the papers.

"While we're on bad communications, let's get one thing straight. For all his faults, I didn't fire Ron, or even 'displace' him, as he said. I offered him a perfectly good job handing out press releases in the Saltonstall Building someplace.

"All these months, I've been dying to get friendly with the press, but Ron kept shouldering me aside, wanting the spotlight for himself.

"And people got the wrong idea. When Ron jumped out there to deal with the Guptill and Clifford firings and to face the demonstration of shouting welfare mothers, people thought I was cowering in my office and had fed Ron to the wolves. Actually I was champing at the bit to demonstrate my 'can-do' approach to problem-solving.

"For the sake of accuracy, I must reveal this: Ron is the one with the taste for lobster salad — and tail meat only, please. The Globe smeared me terribly with that picture of a nice, big lobster on Page One. I wanted to talk to the public, to tell the taxpayers the truth — that when they paid $260 for dinner for me and a trooper and Tommy McGee and his wife and his son, it wasn't lobster at all. It was only cold cuts that cost $52 per person.

"I should have learned my lesson early. Marty Burke, my press secretary during the campaign, seemed to be working out until he actually started talking to reporters. Naturally, I had to get rid of him. I tried to set both Marty and Ron straight by embarrassing them in public, but it didn't work.

"Ron turned out to be a big mistake. When I brought him over from MassPort, the most he'd ever done was coordinate press activities at Logan Airport when a DC-9 smashed into the sea wall there. He'd never worked a real disaster.

"Now things will be different. From now on, Ed King will have the best PR man in the business: Ed King."

For a recorded actuality of Gov. Edward J. King reading this press release, call "Dial-a-Governor" — 1-800-632-8222.

Robert L. Turner is a Globe political columnist.

APPENDIX F.

MISSING VIP

David Farrell

When the S.S. Volendam sailed from Commonwealth Pier on Gov. Edward J. King's "Cruise To Nowhere" fundraiser a fortnight ago, there was one VIP missing from the passenger list. David R. (Dick) Thissen, controversial head of the Desmond & Lord architectural firm, which ran aground during a long investigation by the Special Commission on State and County Buildings last year, passed up the opportunity to spend the night in Massachusetts Bay with King, his longtime friend, business partner and vacation companion.

Under normal conditions, Thissen would have been aboard the liner during the all-night bash, which cost contributors to the governor's re-election campaign $200.

But these are not usual times for Thissen, whose hard-pressed firm merged with John Carl Warnecke & Associates two years ago when it became apparent that the probe of Desmond & Lord by the Ward commission was having a devastating effect on D & L's ability to attract new architectural business in this area. Thissen and the new firm's owner, John Carl Warnecke, have collaborated on several architectural jobs awarded Thissen's old firm during the past two decades.

The personable Thissen, once highly visible, has become a political recluse of sorts and is avoiding the spotlight as much as possible. He still swims at the University Club but is seldom seen at many of the haunts he used to frequent.

It wasn't long ago that he and the governor dined on a regular basis at various restaurants in the metropolitan area. But all that has changed because of the adverse impact the Ward commission notoriety has had on Thissen ability's [sic] to generate business for the Warnecke firm.

Except for an occasional fundraiser or wedding reception, the two friends rarely get together, as they once did, at such popular restaurants as Anthony's Pier 4 and Jimmy's Harborside. The last time this occurred was about 10 weeks ago when Secretary of Administration and Finance Edward Hanley invited Thissen to the wedding reception for one of his daughters at Pier 4. That, in itself, was surprising since Hanley has never associated with or been an admirer of Thissen. Hanley privately places much of the blame for the deterioration of King's public image on Thissen.

The governor has never run away from Thissen, even in the face of strong recommendations by Hanley et al that he would be better off putting some distance between himself and Thissen. This personal loyalty King manifests towards associates never was more apparent than during the recent in-fighting over a satisfactory racing bill for the industry. Despite his close associ-

ation with out-of-state dog racing promoter Eddie Keelan, King has made no secret of his efforts to do Keelan's bidding on the legislation that would greatly benefit the harness track at Foxborough owned by Keelan and his partners.

King still slips out of town with Thissen. They went to Saratoga for the races last August as they do every summer. Over the Easter holidays last spring, they were at the races in Florida. And this Christmas, as they do every Christmas, they are expected to be together in Miami for the winter racing season.

Thissen's pass-up of King's invitation to join him at the Miami Dolphins-Patriots football game here two Sundays ago is indicative of Thissen's plan to make himself more scarce as the 1982 gubernatorial campaign builds.

He is a very close friend and golfing partner of US House Speaker Thomas P. (Tip) O'Neill Jr., a fact which puts him in an embarrassing middle as the upcoming battle by Lt. Gov. Thomas P. O'Neill 3d to wrest the governorship from King intensifies. Over the three decades since the elder O'Neill was speaker of the Massachusetts House, Thissen has been an intimate.

What makes the situation difficult for Thissen is that O'Neill's son, the lieutenant governor, has been attacking King (and former Gov. Michael S. Dukakis) with increasing tempo of late. As a result, Thissen, who has been a most generous campaign donor to the governor and both O'Neills, will have to sit out the 1982 battle and content himself with giving them equal contributions.

Dukakis, meanwhile, is planning to make the close relationship between King and Thissen part of his own campaign for another term. The ex-governor's campaign strategists are also assuming that the Thissen association with the O'Neill family will not be overlooked by the electorate.

Dukakis is expected to focus on the King-Thissen links, particularly their efforts to undermine and thwart the work of the Ward commission in 1979 and 1980.

Thissen and King still maintain close business relationships. They are in the coal business with Red Sox players Carl Yastrzemski and Dwight Evans. The four have invested some $300,000, according to Yastrzemski, in a West Virginia coal mine which has not done well. They recently replaced the general manager of coal operations in an effort to get more production and profits.

On the side, Thissen, who always has had a sharp eye for good investments, continues to develop other relationships with men such as Bruins' president Paul Mooney.

Still unresolved and ahead of him is the allegation by the Ward commission that his former firm illegally contributed $1100 to Gov. King's 1978 campaign through a Desmond & Lord secretary. The commission referred that matter to Atty. Gen. Francis X. Bellotti, who is expected to make a decision on it soon.

David Farrell is a Globe political columnist.

APPENDIX G.

Ed King's promises not money in bank

David Farrell

After the controversial Primary Source liquor bill squeaked through the House and Senate at the end of October, chain store owner Freddy Martignetti breathed a sigh of relief. All that he needed was the signature of Gov. Edward J. King.

Martignetti and the governor had discussed the bill and Martignetti's industry problems on several occasions during recent years. And he had King's word that he would sign the measure. That was like having money in the bank.

Martignetti and King had been good friends since their BC High days when Freddy and twin brother Joe met King. The Freddy Martignettis and the Kings socialized over the years, at house parties and other get-togethers. The athletic prowess of the Martignetti children was another bond with the governor, who is well known for his partiality to and idolization of athletes. Most recently, King and Freddy spent considerable time together at the wedding and reception for one of the Martignetti children several weeks ago.

Now for the first time in seven years, Freddy Martignetti could see some daylight in his long battle with the State Alcoholic Beverages Control Commission (ABCC) and the courts over the number of package stores he may legally operate.

Bill's opponents knew their man

The 56-year-old Martignetti knew that the commission decisions which mandated him to get rid of some of his stores because he violated the spirit of the three-store statute would stand, no matter what happened to the Primary Source bill.

But enactment and signing of the measure, whose main provision would bar retail outlets from dealing with out-of-state wholesalers, also would mean that the three-license limit would be scrapped and raised to a seven-license plateau. Martignetti thus would be able to reshuffle his empire and get his business back to the successful peak it enjoyed before the ABCC moved against him.

But while Martignetti, Bruce Wright, Sam Stone and other proponents of Primary Source were laboring so diligently to get the legislation through the House and Senate, opponents, led by Whitehall's Marvin Gordon, came up with a clever strategy that would have appeal only to a governor of King's peculiar makeup.

King was being pressured by public interest groups and some of his own advisers to sign the bottle bill that was so strongly opposed by all liquor interests, Martignetti included, on both sides of the Primary Source controversy. To make it appear that he was seriously weighing the merits of

the bottle bill, King even went to Michigan to review that state's excellent experience with its bottle law.

Since Primary Source had been painted by its opponents as an anti-consumer bill which would hike the price of liquor in Massachusetts and send consumers here to New Hampshire liquor stores, why not blunt the anticipated consumer outrage over a bottle bill veto with a veto of Primary Source? King was asked.

The governor, who had teased the public all summer with his well-orchestrated charade about "rethinking" his previous stand against the bottle bill, jumped at the inviting prospect of mitigating the public outcry against his rejection of the anti-litter legislation with his pitch to the consumer on Primary Source.

It didn't matter to King that the liquor legislation was fashioned by his own special commission and tailored precisely along lines dictated by him. That panel, headed by King's ABCC chairman, John Larkin, labored for months to produce the bill for King.

So it was on the eve of Halloween when Freddy Martignetti learned that Ed King, his pal, planned to veto Primary Source.

"I'm sick. I can't believe it," a stunned Martignetti told everyone he ran into during the next 48 hours.

He couldn't believe that his longtime friend could welch on the commitment and go back on his word. Sure, he had heard some of the many stories about King's unreliability, but he either didn't believe them or didn't want to, on the assumption that his bond with "Eddie" transcended any possibility of a run-out by the governor.

At least he isn't alone

When Martignetti finally got in to see King last Wednesday to discuss the matter, the answer was the same. King tried to soften the blow by suggesting that he could send a special message to take care of Martignetti's package store problem, but Martignetti wasn't taken in, knowing there was no chance such a proposal could survive by itself.

Thus does Martignetti join a growing list of people, many of them former friends of the governor, who have been duped by the chief executive. The list of Walter Hurleys, Paul Heffernans et al is too long to detail in this space. Frank Rich, who grew up with the governor in East Boston, is the most notable of the group. He got burned so often by King's failure to keep his word and commitments that he decided to run against him.

King's next walkout will embrace Quincy Mayor Arthur Tobin, a former state senator who had expected to be appointed clerk/magistrate of Quincy District Court.

When former clerk Dinny Ryan died earlier this year, King confided in intermediaries that Tobin was in the driver's seat for the position. So certain was Tobin of that commitment that he did not seek re-election last week.

But now King has had his faithful servants on his Judicial Nominating Committee come up with another candidate — this one an assistant court

clerk in Plymouth County — and Tobin will be sacrificed. The upcoming bypass of Tobin has worsened the governor's already poor relations in the Senate where Tobin was a popular member. And it has relegated Senate President William M. Bulger's break with King to point-of-no-return status.

Intermediaries have been trying to heal the chasm between Bulger and King, but to no avail. Now their differences are irreconcilable.

In his dealings with the Senate leader, with House Speaker Thomas W. McGee and virtually everyone else in state government, King has demonstrated an attitude which demands total obeisance in exchange for whatever patronage crumbs the governor sees fit to dispense.

It has taken some political figures a long time to realize that King operates on a one-way street and regards all other state officials — duly elected constitutional officers, elected legislators, judges and other members of the judiciary — as subordinates of the executive, with their principal function to serve him, the master.

That condescending attitude never was more in evidence than in October when King called a judge and demanded that he change a decision he had rendered in a gang-rape case. The judge acquiesced and proved two things: 1.) King's original appointment of him was a colossal blunder. 2.) He is unfit to remain on the bench.

David Farrell is a Globe political columnist.

NOLAN, J. (concurring in part and dissenting in part). I agree with the court's determination that the case should be remanded to the Superior Court for trial on counts 1 and 2, the counts in which the plaintiff alleges that he was libeled by the Farrell column of November 8, 1981. I also agree with the court's determination that the Superior Court correctly granted summary judgment with respect to counts 3 through 6 and counts 9 through 12. I disagree, however, with the court's disposition regarding the Ackerley billboard cartoon (Appendix C) which is the subject of counts 7 and 8. Because I think that there is a material issue of fact to be resolved, I dissent from that portion of the court's opinion which affirms the granting of summary judgment on those counts.

A jury question exists in a defamation action if the challenged statement is susceptible of being read by an average reader as either a factual statement or an opinion. *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 733-734 (1986). *Myers* v. *Boston Magazine Co.*, 380 Mass. 336, 339-340 (1980). A cartoon is subject to the law of libel and, like any other form of depiction, "it may be found libelous if it maliciously presents as fact defamatory material which is false." *Yorty* v. *Chandler*, 13 Cal. App. 3d 467, 472 (1970). See *Russell* v. *McMillen*, 685 P.2d 255, 259 (Colo. Ct. App. 1984); Restatement (Second) of Torts § 566 comment d (1977). In *Yorty*, the court suggested that "a political cartoon which falsely depicts a public official selling franchises for personal gain, or a judge taking a bribe, or an attorney altering a public record, or a police officer shooting a defenseless prisoner, will not be exempt from redress under the laws of libel merely because the charge is depicted graphically in linear form rather than verbally in written statement." *Yorty, supra* at 472. Such is the nature of the cartoon here. Notwithstanding the facts disclosed in the accompanying editorial, the average reader could have interpreted that cartoon as stating that the Governor and the Secretary of Transportation accepted cash bribes in exchange for taking actions favorable to Ackerley Communications and to the billboard industry. Contrary to the defendants' assertions, nothing in the cartoon suggests that persons associated with

Ackerley Communications merely contributed toward the Governor's campaign. The use of the word "pockets," along with the depiction of bags of cash in the hands of the Governor and the Secretary (who had no campaign fund to accept contributions), could lead the average reader to conclude that Ackerley Communications bribed the Governor and his cabinet secretary. "[W]hen an 'opinion' is something more than a generally derogatory remark [and] is laden with factual content, such as charging the commission of serious crimes, the First Amendment confers no absolute immunity." *Cianci* v. *New Times Publishing Co.*, 639 F.2d 54, 63 (2d Cir. 1980). Since the average reader could have interpreted the cartoon as charging a serious crime, it is for the jury to determine whether the cartoon was in fact defamatory.

I also think there is an issue of fact for the jury on whether the defendants acted with actual malice in publishing the Ackerley cartoon. Actual malice is proved "by a showing that the defamatory falsehood was published with knowledge that it was false or reckless disregard of whether it was false." *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 867 (1975). In this case both the cartoonist and the editor of the editorial page were aware that Ackerley had not actually put money in the pockets of the Governor or the Secretary of Transportation, yet neither the cartoonist nor the editor took any steps to disclose this fact in the cartoon. In addition, both the cartoonist and the editor could not remember whether they read the entire news story on which the cartoon was based. If the jury were to conclude that the cartoon made false and defamatory statements of fact, the jury would also be warranted in drawing inferences from these omissions in finding malice. Thus, I would remand the case for trial on the Ackerley cartoon as well as on the Farrell column. "The protection of the freedom of a responsible press does not require that we insulate from liability for libel the artists whose pens drip venom and whose skill in drawing and cartooning far exceeds their sense of responsibility, respect for the truth and the depth of their understanding of public issues." *Yorty, supra* at 479 (Compton, J., concurring in the result).