DONALD THOMAS SCHOLZ & another[1] *vs.* MICKI DELP.
DONALD THOMAS SCHOLZ *vs.* BOSTON HERALD, INC.,
& others.[2]

Suffolk. November 4, 2014. - November 25, 2015.

Present: SPINA, BOTSFORD, DUFFLY, & LENK, JJ.

*Libel and Slander. Practice, Civil,* Summary judgment, Costs.

Discussion of a plaintiff's burden to withstand a defendant's motion for sum-
mary judgment on a defamation claim. [249-251]

In a civil action in which the plaintiff asserted claims against a newspaper and
its columnists concerning articles they wrote and published that allegedly
insinuated that the plaintiff was responsible for a person's suicide, as well as
claims against the person's former wife (whose statements appeared in the
articles), the Superior Court judge properly granted summary judgment to
the newspaper and columnists on a defamation claim, where the statements
in the articles could not have been understood by a reasonable reader to have
been anything but opinions regarding the reason the person committed
suicide, where the use of cautionary terms in the articles relayed that the
columnists were indulging in speculation, where the articles appeared in an
entertainment news column replete with rhetorical flair, and where the
logical nexus between the facts and the opinion was sufficiently apparent to
render unreasonable any inference that the derogatory opinion must have
been based on undisclosed facts; moreover, the plaintiff could not establish
his claim of intentional infliction of emotional distress against the newspaper
and columnists that was derivative of the defamation claim [251-254];
further, summary judgment also was properly granted to the former wife on
a defamation claim, where a reasonable reader of her statements in the
articles would conclude that they either asserted nondefamatory facts or were
opinions that did not imply undisclosed defamatory facts [255-256].

In a civil action, the judge did not abuse his discretion in awarding deposition
costs to the defendants, where such costs may be awarded whether or not the
deposition was actually used at trial, and where the judge carefully evaluated
the costs as required by Mass. R. Civ. P. 54 (e). [254]

CIVIL ACTION commenced in the Superior Court Department on
October 12, 2007.

The case was heard by *John C. Cratsley,* J., on a motion for
summary judgment.

---

[1]The DTS Charitable Foundation, Inc.

[2]Gayle Fee and Laura Raposa.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

CIVIL ACTION commenced in the Superior Court Department on March 11, 2010.

The case was heard by *Frances A. McIntyre*, J., on a motion for summary judgment, and a motion for costs was heard by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Nicholas B. Carter* (*Edward Foye* & *Seth J. Robbins* with him) for the plaintiffs.

*Kathy B. Weinman* for Micki Delp.

*Jeffrey S. Robbins* for Boston Herald, Inc.

*Bruce D. Brown* & *Gregg P. Leslie*, of the District of Columbia, & *Cynthia A. Gierhart*, of New York, for Reporters Committee for Freedom of the Press & others, amici curiae, submitted a brief.

DUFFLY, J. In the mid-1970s, Donald Thomas Scholz, a musician, composer, recording engineer, and record producer, founded the rock band "Boston." After many years playing in the band, Brad Delp, who was its lead singer, committed suicide on March 9, 2007. The Boston Herald, Inc., published three stories regarding Brad's suicide, written by columnists Gayle Fee and Laura Raposa, who relied on information from Brad's former wife, Micki Delp,[3] and various unnamed "insiders" and "friends." Scholz filed an action for defamation in the Superior Court against Micki, arguing that the statements made by her and reported in the newspaper articles insinuated that Scholz was responsible for Brad's suicide. Scholz later brought an action in the Superior Court for defamation and intentional infliction of emotional distress against the Boston Herald, Inc., and its two columnists (collectively, the Herald), based on the same statements as reported in the three articles.

The two cases were consolidated in the Superior Court after Micki had filed a motion for summary judgment. In August, 2011, a Superior Court judge allowed Micki's motion, Scholz appealed, and the Appeals Court reversed.[4] See *Scholz* v. *Delp*, 83 Mass. App. Ct. 590 (2013). We granted Micki's petition for

---

[3]Because they share a last name, we refer to Brad Delp and Micki Delp by their first names.

[4]When the appeal was heard in the Appeals Court, Micki apparently had not sought, and the judge had not entered, final judgment on the claim against her. The Superior Court docket sheet does not reflect that a motion under Mass. R.

further appellate review. Thereafter, in ruling on the Herald's motion for summary judgment, a different Superior Court judge concluded that Scholz could not establish a required element of his libel claim, i.e., that the articles contained any false statements of fact, and allowed the Herald's motion for summary judgment on the ground that the reported statements constituted non-actionable opinion. The judge also allowed the Herald's motion for costs. We granted Scholz's petition for direct appellate review, and paired the cases for argument.

We conclude that the newspaper articles and statements contained therein constitute nonactionable opinions based on disclosed nondefamatory facts that do not imply undisclosed defamatory facts.[5] Because the statements even arguably attributing responsibility for Brad's suicide to Scholz were statements of opinion and not verifiable fact, and therefore could not form the basis of a claim of defamation, we conclude that summary judgment properly was entered for the Herald by the second motion judge, and that the first motion judge correctly allowed Micki's motion for summary judgment.

1. *Background.* We summarize the undisputed facts, drawn from the summary judgment record. The band Boston was founded in 1975, after Scholz and Brad obtained a recording contract with CBS/Epic Records, and Scholz hired band members Barry Goudreau, Sib Hashian, and Fran Sheehan to join the group. The band toured very successfully for a number of years, but, approximately thirty years before Brad's death, there was a falling out between Scholz and the latter three band members. All of the original members of the group, other than Scholz and Brad, left the band. Scholz continued to tour with different group members,

Civ. P. 54 (b), 365 Mass. 820 (1974), was filed, or that a rule 54 (b) certification was issued.

Where no final judgment had entered on that claim, Donald Thomas Scholz's appeal to the Appeals Court properly should have been dismissed as premature. See *Gangell* v. *New York State Teamsters Council Welfare Trust Fund,* 6 Mass. App. Ct. 631, 632, (1978). At this point, however, the judgment as to the Boston Herald, Inc., and its two reporters (collectively, the Herald) is final, the issues have been fully briefed by all parties, and the heavily interrelated claims are all before us. Because remand for further proceedings in the Superior Court would not be consistent with judicial economy, we exercise our discretion to decide the issues raised in Scholz's appeal from the decision allowing Micki's motion for summary judgment.

[5] We acknowledge the amicus brief submitted by the Reporters Committee for Freedom of the Press and twenty-five others.

including Brad, under the name "Boston." Fran Cosmo joined the band as a backup singer for Brad, and as he got older and had more difficulty reaching the high notes for which Boston was known, Brad was dependent on Cosmo's voice as backup to his. In addition to touring with the band, Brad maintained his friendship with the former members of the group, who had discontinued all contact with Scholz, and played with them when he was able to do so.

Brad had a long history of anxiety and depression. He suffered from stage fright before performances with Boston and with another group with which he had played in the early 1990s. In 1991, Brad was prescribed anti-anxiety medication, which did not help. Micki and Brad separated that year. They were divorced in 1996, after sixteen years of marriage, due to Brad's mental health issues, but they remained friends. Brad began dating Pam Sullivan in 2000; they were engaged on December 25, 2006, and planned to marry in August, 2007. Pam and her younger sister Meg[6] moved into Brad's house.

Sometime at the end of 2006, Scholz told Brad that Boston would be performing on tour in the summer of 2007, and that rehearsals for the tour would begin on March 24, 2007. On February 28, 2007, Scholz told Brad that the initial summer performances had been confirmed. While the plan had been that Cosmo would join the tour, that invitation was rescinded. On March 1, 2007, Scholz sent an electronic mail message to Brad advising him that the summer tour was not confirmed.

At around the same time, Meg discovered that Brad had taped a small camera to the ceiling in her bedroom. Brad sent electronic mail messages to Meg and her boy friend expressing his sorrow over having "victimized" her and saying that he had "committed the most egregious act against her." Meg responded, expressing concern that Brad would do something to harm himself. Brad replied, "I don't think anyone could think less of me as a person as I am feeling about myself at this moment." Two days later, Brad informed Pam of his installation of the camera; Pam also feared that Brad would harm himself.

Brad committed suicide on March 9, 2007, having purchased the means to do so on March 8. He left several suicide notes, including one addressed to Pam, one to Micki, one to his two

---

[6]Because Pam and Meg Sullivan share a last name, we refer to them by their first names.

adult children, one to Meg and her boy friend, and two for the public. One of the notes that were made public said, "Mr. Brad Delp. J'ai une solitaire. I am a lonely soul," and, "I take complete and sole responsibility for my present situation." The note also said, in reference to Pam, "[U]nfortunately she is totally unaware of what I have done."

In March, 2007, the Herald published two articles concerning Brad's suicide. The articles, written by Fee and Raposa, appeared in the newspaper's entertainment news column, "Inside Track." The first article, published on March 15, 2007, was titled, "Suicide confirmed in Delp's death," and stated that it was based on information from "unnamed insiders."[7]

The March 15 article stated, in relevant part:

> "Friends said it was Delp's constant need to help and please people that may have driven him to despair. He was literally the man in the middle of the bitter break-up of Boston — pulled from both sides by divided loyalties.

> "Delp remained on good terms with both Tom Scholz, the MIT grad who founded the band, and Barry Goudreau, Fran Sheehan and Sib Hashian, former members of Boston who had a fierce falling out with Scholz in the early '80s.

> "Delp tried to please both sides by continuing to contribute his vocals to Scholz' Boston projects while also remaining close to his former bandmates. The situation was complicated by the fact that Delp's ex-wife, Micki, is the sister of Goudreau's wife, Connie.

> " 'Tom made him do the Boston stuff and the other guys were mad that they weren't a part of it,' said another insider. 'He was always under a lot of pressure.'

> "   . . .

> "Scholz' penchant for perfection and his well-chronicled control issues led to long delays between albums. As a result, Goudreau, Delp and Hashian released an album without him, which led to an irretrievable breakdown.

---

[7]Testimony from Gayle Fee during the course of this litigation confirmed that the "insider" information in the first article came from Brad's former manager, Paul Geary, and his long-time friend Ernie Boch, Jr., who also was a friend of Barry Goudreau and Sib Hashian.

"     . . .

"But the never-ending bitterness may have been too much for the sensitive singer to endure. Just last fall the ugliness flared again when Scholz heard some of his ex-bandmates were planning to perform at a tribute concert at Symphony Hall for football legend Doug Flutie — and then had his people call and substitute himself and Delp for the gig, sources say.

"In fact, the wounds remained so raw that Scholz wasn't invited to the private funeral service for Delp that the family held earlier this week.

" 'What does that tell you?' asked another insider. 'Brad and Tom were the best of friends and he's been told nothing about anything.' "

On the day the article was published, Fee made a radio appearance in which she said that Scholz had caused Brad nothing but "grief." On the same day, both Herald reporters spoke with Micki, who ultimately had agreed to their request for an interview after initially declining to give one. Following the interview, Fee sent an electronic mail message to Scholz's publicist, stating that Micki had said, "Brad was in despair because [Cosmo] was disinvited from the summer tour," and asking for comment. Scholz responded that the decision to fire Cosmo had been a group decision.

On March 16, 2007, the Herald published a front-page article entitled, "Pal's snub made Delp do it: Boston rocker's ex-wife speaks." The article stated, in relevant part:

"Boston lead singer Brad Delp was driven to despair after his longtime friend Fran Cosmo was dropped from a summer tour, the last straw in a dysfunctional professional life that ultimately led to the sensitive frontman's suicide, Delp's ex-wife said.

" 'No one can possibly understand the pressures he was under,' said Micki Delp, the mother of Delp's two kids, in an exclusive interview . . . .

" 'Brad lived his life to please everyone else. He would go out of his way and hurt himself before he would hurt somebody else, and he was in such a predicament professionally that no matter what he did, a friend of his would be hurt.

Rather than hurt anyone else, he would hurt himself. That's just the kind of guy he was.'

"Cosmo, who had been with Boston since the early '90s, had been 'disinvited' from the planned summer tour, Micki Delp said, 'which upset Brad.'

"But according to Tom Scholz, the MIT-educated engineer who founded the band back in 1976, the decision to drop Cosmo was not final and Delp was not upset about the matter. (Cosmo's son Anthony, however, was scratched from the tour.)

" 'The decision to rehearse without the Cosmos was a group decision,' Scholz said in a statement through his publicist. 'Brad never expressed unhappiness with that decision . . . and took an active part in arranging the vocals for five people, not seven.'

"   . . .

"Sullivan told police that Delp 'had been depressed for some time, feeling emotional (and) bad about himself,' according to the reports.

"According to Micki Delp, Brad was upset over the lingering bad feelings from the ugly breakup of the band Boston over 20 years ago. Delp continued to work with Scholz and Boston but also gigged with Barry Goudreau, Fran Sheehan and Sib Hashian, former members of the band who had a fierce falling out with Scholz in the early '80s.

"As a result, he was constantly caught in the middle of the warring factions. The situation was complicated by the fact that Delp's ex-wife, Micki, is the sister of Goudreau's wife, Connie.

" 'Barry and Sib are family and the things that were said against them hurt,' Micki said. 'Boston to Brad was a job, and he did what he was told to do. But it got to the point where he just couldn't do it anymore.' "

On July 2, 2007, the Herald published a third article concerning Brad's suicide. The article, entitled "Delp tribute on," included a paragraph stating that Scholz and the original members of the band Boston "have been at odds for decades and the lingering bad feelings from the breakup of the original band more than 20 years ago reportedly drove singer Delp to take his own life in March."

2. *Discussion.* a. *Standard of review.* Summary judgment is appropriate where, "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue. See *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 32 (2006). "[The] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if [the moving party] demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 629 (2003), quoting *Dulgarian* v. *Stone*, 420 Mass. 843, 846 (1995). "Because our review is de novo, we accord no deference to the decision of the motion judge." *Caron* v. *Horace Mann Ins. Co.*, 466 Mass. 218, 221 (2013), quoting *DeWolfe* v. *Hingham Ctr., Ltd.*, 464 Mass. 795, 799 (2013). The use of motions for summary judgment is favored in defamation cases. See *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 480 (1985), citing *Cefalu* v. *Globe Newspaper Co.*, 8 Mass. App. 71, 74 (1979), cert. denied, 444 U.S. 1060 (1980).

b. *Plaintiff's case on a defamation claim.* To withstand a motion for summary judgment on a defamation claim, a plaintiff must have a reasonable expectation of proving four elements: first, the defendant made a statement, of and "concerning the plaintiff, to a third party"; second, the "statement could damage the plaintiff's reputation in the community"; third, the defendant was at fault for making the statement;[8] and fourth, the statement caused economic loss or, in four specific circumstances, is actionable without economic loss. See *Ravnikar* v. *Bogojavlensky, supra* at 629-630.

Furthermore, to be actionable, the statement must be one of fact rather than of opinion. "Statements of pure opinion are constitu-

---

[8]"The level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 630 (2003). Here, because Scholz concedes that he is a limited purpose public figure, to prevail he must prove that the challenged statements were made with actual malice. See *Astra USA, Inc.* v. *Bildman*, 455 Mass. 116, 143-144 (2009), cert. denied, 560 U.S. 904 (2010).

tionally protected," *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988), "[b]ut there is no constitutional value in false statements of fact." *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 227 (1979), cert. denied, 446 U.S. 935 (1980), quoting *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas"). Whether a statement is a factual assertion or an opinion is a question of law "if the statement unambiguously constitutes either fact or opinion," and a question of fact "if the statement reasonably can be understood both ways." *King* v. *Globe Newspaper Co.*, *supra* at 709, quoting *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 733 (1986). See *Howell* v. *Enterprise Publ. Co.*, 455 Mass. 641, 671 (2010). While "[a] statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' " *Levinsky's, Inc.* v. *Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997), quoting *Haynes* v. *Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993), a statement that does not contain "objectively verifiable facts" is not actionable. *Levinsky's, Inc.* v. *Wal-Mart Stores, Inc.*, *supra*, quoting *Haynes* v. *Alfred A. Knopf, Inc.*, *supra*. See *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303, 312, cert. denied, 459 U.S. 1037 (1982) (statements which cannot be proved false cannot be deemed statements of fact).

As we have noted, "it is much easier to recognize the significance of the distinction between statements of opinion and statements of fact than it is to make the distinction in a particular case. . . . Nevertheless, sensible lines must be drawn." *King* v. *Globe Newspaper Co.*, *supra* at 709. In determining whether a statement reasonably could be understood as fact or opinion, a court must "examine the statement in its totality in the context in which it was uttered or published," and "must consider all the words used, not merely a particular phrase or sentence." *Cole* v. *Westinghouse Broadcasting Co.*, *supra* at 309, quoting *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980). See *Driscoll* v. *Board of Trustees of Milton Academy*, 70 Mass. App. Ct. 285, 297 (2007). Factors to be considered include "the specific language used"; "whether the statement is verifiable"; "the general context of the statement"; and "the broader context in which the statement appeared," see

*Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 9 (1990), quoting *Scott* v. *News-Herald*, 25 Ohio St. 3d 243, 250 (1986); as well as any "cautionary terms used by the person publishing the statement." *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 263 (1993), quoting *Fleming* v. *Benzaquin*, 390 Mass. 175, 180 (1983).

c. *Claims against the Herald.* Scholz contends that the Herald articles are actionable because they impliedly assert that Scholz was responsible for Brad's death. To support his argument that the articles contain actionable statements of fact, Scholz points in particular to the headline of the March 16, 2007, article, "Pal's snub made Delp do it: Boston rocker's ex-wife speaks." We do not agree.

We begin with the observation that, ordinarily, ascertaining the reason or reasons a person has committed suicide would require speculation; although a view might be expressed as to the cause, rarely will it be the case that even those who were close to the individual will know what he or she was thinking and feeling when that final decision was made. While we can imagine rare circumstances in which the motivations for a suicide would be manifestly clear and unambiguous, this is not such a case.

The statements at issue could not have been understood by a reasonable reader to have been anything but opinions regarding the reason Brad committed suicide. "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, . . . the statement is not actionable." *Haynes* v. *Alfred A. Knopf, Inc.*, *supra* at 1227. See *Milkovich* v. *Lorain Journal Co.*, *supra* at 9. See, e.g., *Gacek* v. *Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147-1148 (8th Cir. 2012) (concluding that "anyone is entitled to speculate on a person's motives from the known facts of his behavior," and that statements that plaintiff "pushed [the decedent] over the edge," was "the straw that broke the camel's back," and "was the reason for [the decedent's] death" were nonactionable because they did not express objectively verifiable facts but, rather, were defendant's "theory" or "surmise" as to decedent's motives in taking his own life [citation omitted]). Cf. *National Ass'n of Gov't Employees/ Int'l Bhd. of Police Officers* v. *BUCI Tel., Inc.*, 118 F. Supp. 2d 126, 131 (D. Mass. 2000) ("the interpretation of another's motive does not reasonably lend itself to objective proof or disproof").

In addition, the use of cautionary terms in the articles, such as "may have" and "reportedly," relayed to the reader that the authors were "indulging in speculation." See *King* v. *Globe Newspaper*

*Co., supra* at 713. See also *Milkovich* v. *Lorain Journal Co., supra* at 31 ("[c]autionary language ... put[s] the reader on notice that what is being read is opinion" [quotation omitted]); *Cole* v. *Westinghouse Broadcasting Co., supra* at 309, quoting *Information Control Corp.* v. *Genesis One Computer Corp., supra* at 784 ("the court must give weight to cautionary terms used by the person publishing the statement"). The most extreme language appeared in the headline, which a reasonable reader would not expect to include nuanced phrasing. See *Test Masters Educ. Servs., Inc.,* v. *NYP Holdings, Inc.,* 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) ("A newspaper need not choose the most delicate word available in constructing its headline; it is permitted some drama in grabbing its reader's attention, so long as the headline remains a fair index of what is accurately reported below"). See, e.g, *Dulgarian* v. *Stone,* 420 Mass. 843, 850-851 (1995) (title of television news series, "Highway Robbery?," reporting on automobile insurance appraiser's business, constituted "rhetorical flourish or hyperbole, which is protected from defamation liability").

Moreover, the Herald articles appeared in an entertainment news column. See *Cole* v. *Westinghouse Broadcasting Co., supra* at 309, quoting *Information Control Corp.* v. *Genesis One Computer Corp., supra* at 784 ("the court must give weight to ... the medium by which the statement is disseminated and the audience to which it is published"). "While not on the 'op-ed' page of the newspaper, the article[s were] replete with rhetorical flair." *Howell* v. *Enterprise Publ. Co., supra* at 671-672. In context, a reasonable reader would consider the statements about the cause of Brad's suicide to have been nothing more than conjecture or speculation, reflecting the opinion of the speaker. See *Moldea* v. *New York Times Co.,* 22 F.3d 310, 314 (D.C. Cir.), cert. denied, 513 U.S. 875 (1994) (context of statements "helps determine the way in which the intended audience will receive them").

Scholz argues that, even if we conclude that the articles contained statements of opinion rather than facts, the use of the words "insiders" and "friends" in the "Inside Track" column indicated the existence of undisclosed defamatory facts. We recognize that there is no "wholesale defamation exemption for anything that might be labeled 'opinion.' " *Milkovich* v. *Lorain Journal Co., supra* at 18. Even a statement that is "cast in the form of an opinion may imply the existence of undisclosed defamatory facts on which the opinion purports to be based, and

thus may be actionable." *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 713 (1987). By contrast, an opinion "based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is." *Dulgarian* v. *Stone*, 420 Mass. 843, 850 (1995), quoting *Lyons* v. *Globe Newspaper Co.*, *supra* at 262.

We conclude that, here, "[t]he logical nexus between the facts and the opinion was sufficiently apparent to render unreasonable any inference that 'the derogatory opinion must have been based on undisclosed facts.' " *Lyons* v. *Globe Newspaper Co.*, *supra* at 266, quoting Restatement (Second) of Torts § 566 comment c, second par. (1977). The first article stated that Brad "tried to please both sides," and was the "man in the middle of the bitter break-up"; that "[Scholz] made him do the Boston stuff and the other guys were mad they weren't a part of it"; and that, consequently, Brad "was always under a lot of pressure." The article then commented that "the never-ending bitterness may have been too much for the sensitive singer to endure."

The second article stated that Brad "was driven to despair after his longtime friend . . . Cosmo was dropped from a summer tour, the last straw in a dysfunctional professional life that ultimately led to the sensitive frontman's suicide." This conclusion was based on Micki's statements that "[n]o one can possibly understand the pressures he was under"; Brad "was in such a predicament professionally that no matter what he did, a friend of his would be hurt"; Brad lived his life to please everyone else and was the "kind of guy" who, "[r]ather than hurt anyone else, . . . would hurt himself"; Brad was upset that the invitation to Cosmo to join the band's planned summer tour had been rescinded; Brad was still upset over the lingering bad feelings from the breakup of the band; and Boston was a job, he did what he was told, but "it got to the point where he just couldn't do it anymore."[9] The second article also stated that Brad "had been depressed for some time." The third article referred back to the previous two articles in stating that "lingering bad feelings from the breakup of the original band . . . reportedly drove [Brad] to take his own life."

By laying out the bases for their conclusions, the articles "clearly indicated to the reasonable reader that the proponent of the ex-

---

[9]The second article noted also that, according to Scholz, "the decision to drop Cosmo was not final and Delp was not upset about the matter."

pressed opinion engaged in speculation and deduction based on the disclosed facts." See *Lyons* v. *Globe Newspaper Co.*, *supra* at 266. It does not appear "that any undisclosed facts [about Scholz's role in Brad's suicide] are implied, or if any are implied, it is unclear what [those might be]." See *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303, 313 (1982). Moreover, it is entirely unclear (even assuming that facts are implied) that they are defamatory facts. See *id.*

Because the statements are nonactionable opinion, and Scholz therefore cannot prevail on his defamation claim, he also cannot establish the derivative claim of intentional infliction of emotional distress. See *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 57 (1988); *Rotkiewicz* v. *Sadowsky*, 431 Mass. 748, 755 (2000).

d. *The Herald's motion for costs.* Scholz also challenges on appeal the allowance of the Herald's motion for costs, in the amount of $132,163.89, for stenographic services, deposition transcripts, fees for service of subpoenas, and court filing fees. We review a decision awarding costs for abuse of discretion, see *Waldman* v. *American Honda Motor Co.*, 413 Mass. 320, 328 (1992), and discern none here.

Scholz argues that many of the depositions were not reasonably necessary to decide the case, because the judge's decision rested "solely on a reading of the [newspaper] articles," and, accordingly, the decision to allow the Herald's motion for costs must be reversed. In the alternative, Scholz argues that costs should have been awarded only as to the depositions that he sought and conducted, and not as to depositions sought and conducted by the Herald. We reject Scholz's claim that, in deciding whether to award costs, a judge may consider only the cost of depositions that were noticed by the party against whom summary judgment entered. It is evident from the decision on the Herald's motion for summary judgment that the judge relied extensively on the deposition record; Scholz's claim that the depositions did not affect that decision is unavailing. Moreover, deposition costs may be awarded "whether or not the deposition was actually used at the trial." Mass. R. Civ. P. 54 (e), as amended, 382 Mass. 829 (1981). See, e.g., *Federico* v. *Ford Motor Co.*, 67 Mass. App. Ct. 454, 462-463 (2006) (awarding costs for depositions even where parties eventually settled and defendant was dismissed from case). The judge's decision on the motion for costs reflects careful evaluation of the deposition costs, as required by Mass. R. Civ. P. 54 (e).

e. *Defamation claim against Micki.* While the Herald articles cite statements about the causes of Brad's death from a number of people who knew Brad, the bulk of the statements noted are reported as having been made by Micki.[10] For the same reasons that the Herald articles are nonactionable, we conclude that Micki's statements contained therein likewise are nonactionable. See *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 9 (1990), quoting *Scott* v. *News-Herald*, 25 Ohio St. 3d 243, 250 (1986). A reasonable reader of the Herald articles would conclude that Micki's statements either asserted nondefamatory facts or were opinions that did not imply undisclosed defamatory facts. Even if the statements could have appeared to a reasonable reader to contain defamatory connotations, the facts upon which the opinions were based were "apparent and disclosed." See *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 226 (1979).

A reasonable reader might reach a determination that the statements that Brad was upset about the lingering bad feelings from the breakup of the band, and about the decision to rescind the invitation to Cosmo to join the tour, were factual. These statements, however, do not defame Scholz. A reasonable reader also could conclude that Brad was under pressure as a result of tensions between members of the band, in reliance on Micki's statements that "Brad lived his life to please everyone else"; Brad "was in such a predicament professionally that no matter what he did, a friend of his would be hurt"; and "[n]o one can possibly understand the pressures he was under." These statements also do not defame Scholz. See *Yohe* v. *Nugent*, 321 F.3d 35, 40-41 (1st Cir. 2003).

A reasonable reader also could decide, based on Micki's statements in the articles, that in Micki's opinion, pressure from the band caused Brad to commit suicide. According to the articles, Micki believed that Brad was the "kind of guy" who would hurt himself rather than hurt anyone else; "Boston to Brad was a job, and he did what he was told to do. But it got to the point where he just couldn't do it anymore"; and dropping Cosmo from the tour drove Brad to despair and ultimately to suicide.[11] Whether Brad's motive rested, alone or in combination, on any of the

---

[10]In her deposition testimony, Micki asserted that she had made the statements attributed to her.

[11]Reviewing the record in the light most favorable to Scholz, we attribute this last statement to Micki.

reasons propounded by Micki — Brad's growing weariness at being the middleman between the warring former band members, despondency about the possible cancellation of the tour and the absence of Cosmo from the tour, distress over the bitter feud and Scholz's role in it, or preexisting depression and anxiety — is no longer capable of verification. As discussed *supra*, statements that cannot be proved false cannot be deemed statements of fact. See *Cole* v. *Westinghouse Broadcasting Co.*, *supra* at 312. Moreover, as noted, it is unclear what, if any, undisclosed defamatory facts are implied by Micki's opinion that Brad committed suicide because of the general pressure of being caught in the middle of feuding band members and the specific stress of the withdrawal of the invitation to Cosmo to join the band's tour. See *Yohe* v. *Nugent*, *supra* at 41-42.

Based on any of the above combinations, reasonable readers would conclude, in these circumstances, that the statements concerning Brad's motivations in deciding to take his own life were opinions, given the context and the speculative nature of the comments on the multiple proffered reasons for Brad's suicide. "[A]nyone is entitled to speculate on a person's motives from the known facts of his behavior." *Haynes* v. *Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). See *Yohe* v. *Nugent*, *supra*. See also, e.g., *Gacek* v. *Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147-1148 (8th Cir. 2012).

3. *Conclusion.* The judgment granting summary judgment to the Herald defendants is affirmed, and the order allowing the Herald's motion for costs also is affirmed. The order allowing Micki's motion for summary judgment is affirmed. The matters are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*