SUPERIOR COURT 
 
 LAURA MARINO MELENDEZ v. OPENROUNDS, INC., JONATHAN WYETH and JOSEPH REEL

 
 Docket:
 2384CV00173-C
 
 
 Dates:
 June 5, 2024
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT JOSEPH REEL'S MOTION FOR SUMMARY JUDGMENT
 
 

             Plaintiff Laura Marino Melendez ("Plaintiff' or "Melendez") alleges that, during her employment with Defendant OpenRounds, Inc. ("OpenRounds" or the "Company"), OpenRounds failed to pay her wages due and owing under the Massachusetts Wage Act, G.L. c. 149, § 148 et seq. (the "Wage Act"). Plaintiff seeks to hold OpenRounds liable for such underpayment, together with the Company's president, Jonathan Wyeth ("Wyeth"), and a member of its Board of Directors, Joseph Reel ("Reel"). Reel has moved for summary judgment on the sole remaining count asserted against him for violation of the Wage Act.1 For the reasons which follow, Reel's Motion shall be ALLOWED.
BACKGROUND
            Wyeth founded OpenRounds, a platform designed to allow members of private golf clubs to enjoy certain reciprocal rights of access to other private clubs throughout the United States. At times relevant hereto, Wyeth served as the Company's president, chief executive officer,  treasurer and secretary, as well as a member of its Board of Directors (the "Board"). Between

--------------------------------------------

[1] Plaintiff's Complaint had also asserted a claim of retaliation against all Defendants, but Plaintiff voluntarily dismissed that count, with prejudice, as to Reel only.

                                                            -1-

2014 and 2022, Reel invested more than $1 million in OpenRounds. Reel, however, was never employed by OpenRounds and never served as a corporate officer of the Company. From 2016 to 2022, Reel served strictly as a member of the Board. In this capacity, Reel did not exercise any supervisory authority over Wyeth; nor did he serve OpenRounds in any administrative role independent of his service as a Board member.
            Throughout Reel's tenure on the Board, he and Wyeth routinely discussed the business operations of OpenRounds, and Wyeth often sought Reel's advice and feedback concerning strategic and operational issues affecting the Company. By 2022, these interactions included
weekly communications concerning various facets of OpenRounds' business - viz., investments and partnerships, sales, operations, marketing/engagement, and product development - as well as the job performance of employees within these Company "teams."
            In January, 2022, Wyeth, Reel, and the Board's third member, David Gould, interviewed Plaintiff and other candidates for a position as chief of staff.[2] Fallowing these interviews, Reel conveyed to Wyeth that he supported hiring Plaintiff and/or one other candidate. Wyeth agreed, and OpenRounds hired both. On January 21, 2022, OpenRounds issued Plaintiff a written job offer for the chief of staff position, signed by Wyeth, confirming a salary for Melendez of $110,000 per year and an equity grant of 2,828 shares of stock in the Company to vest over three years. The offer letter provided that Plaintiff would earn no equity if she left OpenRounds of her own accord during the first six months on the job, or if her employment were terminated for cause. Plaintiff accepted this offer. To accommodate the projected equity earnings of Plaintiff and other recent and future Company hires, the Board voted to increase OpenRounds' employee reserved pool of stock.
            Plaintiff began working for OpenRounds in February, 2022. Melendez's role was to

--------------------------------------------

[2] Reel never participated in candidate interviews for any other position of employmenI at OpcnRounds.

                                                            -2-

support Wyeth with the financial and administrative functions of OpenRounds. This included payroll processing, for which Plaintiff collected and transmitted employee documents and information to the Company's outside bookkeeper.
            Shortly after she began at the Company, Wyeth directed Melendez to prepare a termination letter for an employee named Jack Monahan. Plaintiff thereupon drafted a letter stating that OpenRounds would pay Monahan for unused, paid time-off (PTO) accrued as of the date of his termination. Wyeth balked.3 OpenRounds terminated Monahan's employment on February 12, 2022, and Monahan immediately requested a severance package. That same day, Wyeth notified Reel (via text message) of Monahan's termination and his severance request. Reel responded that he did not view a severance package as required or appropriate in these circumstances, and that, to his understanding, all OpenRounds was legally obligated to provide was "pay through termination date and unused vacation time if applicable[.]"(J.A. at 418.) Wyeth agreed, and stated that he would let Monahan "come back to us [on vacation time] ... [as] little if anything accrued." (Id,) Plaintiff, in turn, inf01med Monahan (via email) that OpenRounds would not provide him with severance, but that Monahan could seek unemployment benefits. Monahan responded to Plaintiff and Wyeth that he would "be filing a complaint with the State Attorney General for years of missing/ late payments." (J.A. at 321.) Wyeth forwarded this email chain to Reel and observed, "To make sure I'm clear about his empty threat - there are no payments due to Monahan, he's apparently trying to create an issue that will go no where [sic]." (Id.)
            Thereafter, Wyeth and Reel began sharing concerns with one another regarding Plaintiffs job performance. Thus, on April 27, 2022, Reel noted, based on his discussions with

--------------------------------------------

[3] It is unclear whether Wyeth categorically refused to pay Monahan for unused PTO, or rather believed, as a factual matter, that Monahan had not in fact accrued any unused PTO. Construing the record in the light most favorable to Plaintiff, Bulwer v. Mount Auburn Hosp.,473 Mass. 672,680 (2016), the Court credits the former reason for purposes of ruling on Reel's motion.

                                                            -3-

Wyeth, "[Melendez] fully on board 2/21, early performance W1even and damaged our salesperson interview process, we need to evaluate over next several weeks." (J.A. at 308.) Per Wyeth, Melendez's performance deficiencies included repeated errors in Company communications (typos, improper formatting, providing erroneous information, etc.), neglecting to maintain accurate employee expense reports, and failing to be consistently available when Wyeth required assistance.
            On May 20, 2022, Wyeth asked Reel to review an email Wyeth had drafted to send to Melendez. Therein, Wyeth expressed concerns about the consistency and reliability of Plaintiff's work, and proposed a new way forward for Melendez. Plaintiff could elect to remain chief of staff at the Company, subject to a 60 day "performance improvement plan"; or, in the alternative, Plaintiff could agree to have her job restructured, ''which would include a change in title and a reduction in salary and equity to $65,000 per year and 750 shares, respectively." (J.A. at 380-81.) In response, Reel suggested that Wyeth might consider using a less severe term than "performance improvement plan," such as a "60-day review," in order to avoid implying a message of "fix it or you're fired." (Id.). Wyeth agreed that the suggested change was "in-line with reality," and transmitted the revised proposal to Melendez.
            On May 24, 2022, Plaintiff emailed a lengthy response to Wyeth. In this response, Melendez refuted the assertion that she had failed to fulfill the duties of her role, and stated that she viewed Wyeth's proposal as "nothing more than a transparent attempt to deprive me of the equity negotiated in my employment agreement shortly before the Company's forfeiture rights expire." (J.A. at 382.) Plaintiff specifically addressed her prior disagreement with Wyeth concerning her drafting of Monahan's termination letter, insisting that she had merely sought to "comply[ ] with Massachusetts employment laws" and that "[a]ssisting [Wyeth] in violating Massachusetts law and exposing OpenRounds to liability (and you [,Wyeth,] too, considering

                                                            -4-

violation of Massachusetts Wage law includes individual, personal liability) was not in the best interest of the Company or you." (Id.) Plaintiff also recounted another instance when she had
sought to mend a relationship with an entity partnering with OpenRounds. (Id.)
            Minutes later, Wyeth forwarded Plaintiff's email to Reel and stated, ''To be discussed. I believe we have to terminate [Melendez] unfortunately."(!£Ll Within an hour, Wyeth transmitted a follow-up text message to Reel, asking for Reel's "take on what you [Reel] might do" and suggesting that Melendez no longer be included in a planned meeting of the development team. (J.A. at 425.) Reel replied that he did not like the tone of Plaintiff's email, and that he thought termination was justified based on her "false" accusations against Wyeth. (Id.) Reel questioned whether it was a "fire her immediately and cut off access" situation, and suggested that Wyeth
instead compile a list of issues supporting Melendez's tennination. iliLlThereafter, Wyeth continued to discuss discharging Plaintiff with Reel and OpenRounds' chief revenue officer, Chester Patterson ("Patterson"). Wyeth ultimately concluded that OpenRounds would terminate Plaintiff's employment, as her accusations and refusal to address identified performance shortcomings were "unacceptable and a non-starter." (J.A. at 460.)
            On May 30, 2022, Wyeth informed Reel and Patterson that he had reviewed Massachusetts employment law, and that he believed Melendez would need to be paid for her vacation days. Wyeth asked that Reel and Patterson review a termination letter Wyeth had drafted, and stated that he would appreciate any additional research or information they could provide on OpenRounds' legal obligations. (J.A. at 389.) Patterson noted that Plaintiff would need to be paid "whatever she is owed on her last day"(&.); and Reel suggested that the letter state clearly that OpenRounds would pay Melendez for four days of accrued but unused vacation time. (J.A. at 388, 396.)
            On the evening of May 30, 2022, Wyeth emailed Plaintiff to inform her that OpenRounds

                                                            -5-

intended to terminate her employment, and that the Company would pay her through June 3, 2022. In the alternative, OpenRounds would enter into a severance agreement in which it paid Melendez through June 10, 2022. The email further stated that Plaintiff would in all events be paid for four days of accrued but unused vacation time. The next day, Plaintiff responded to Wyeth that it was ''unfortunate"that OpenRounds was ending her employment "as a response to my email related to my equity & your hesitancy to follow Massachusetts wage laws. If you want me to avoid taking legal action, I'd accept severance in the amount of six month's [sic] pay at my current salary and vesting of the full equity award        "(J.A. at 393.)
            Wyeth forwarded Plaintiffs email to Patterson and Reel. Wyeth also texted Reel, stating that Melendez "wants a walk away stake that we'll fight or settle" but further stating that he considered Melendez's demand for severance to be another "non-starter." (J.A. 426.) Wyeth then drafted an equity forfeiture agreement which he emailed to Reei noting it that "might be worth a quick review     I'm confident we're good though as discussed." (J.A. at 395.) Wyeth further texted Reel that "you can't terminate folks for alleging lawsuits, which makes it that much more clear to me to stick with performance." (J.A. 427.)
            On the evening of May 31, 2022, Wyeth emailed Plaintiff the Company's termination letter, stating that it would serve as "official notification" that her employment with OpenRounds was ending effective June 3. OpenRounds paid Plaintiff her earned wages through that date, including pay for the four days of accrued but unused vacation time.
            In June, 2022, OpenRounds received an inquiry from the Department of Unemployment Assistance concerning Melendez's application for benefits. Wyeth notified Reel, and Reel recommended that OpenRounds follow the same policy that the Company's outside counsel had recommended for Monahan.
            Plaintiff filed the present action on January 23, 2023, alleging Wage Act violations

                                                            -6-

(Counts I-III) and retaliation (Count VI) against all Defendants, and asserting contract claims against OpenRounds (Counts IV, V). Regarding her Wage Act claims, Plaintiff maintains that Defendants have failed to issue her stock certificates for her earned equity shares in OpenRounds, and additionally failed to pay her other wages due to her (including for uncompensated time spent "onboarding" prior to her official start date). On April 4, 2023, Plaintiff dismissed her retaliation claim against Reel, with prejudice, pursuant to Mass. R. Civ. P. 4l(a)(ii). Reel now seeks summary judgment against the remaining claim against him for violation of the Wage Act (Count III).
STANDARD OF REVIEW
            "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Helfman v. Northeastern Univ. 485 Mass. 308, 314 (2020), quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-19 (2010). "The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue." Scholz v. Delp. 473 Mass. 242, 249 (2015). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party's case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of her case at trial. Flesner v. Technical Commc'ns Corp. 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, "the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact." Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Gtp., 469 Mass. 800, 804 (2014). "Bare assertions made in the nonmoving party's opposition will not defeat a motion for summary judgment." Id. Accord Mass. R. Civ. P. 56(e) ("IA)n adverse party may not rest upon the mere allegations or denials of his pleading.").

                                                            -7-

DISCUSSION
            "The Wage Act requires employers to compensate their employees for earned wages as set out in G. L. c. 149, § 148." Segal v. Genitrix, LLC, 478 Mass. 551,558 (2017). Section 148 defines "employer'' as a "person having employees in his [or her] service." G. L. c. 149, § 148. As to corporations, this definition includes the corporation itself, as well as the "president and treasurer of [the] corporation and any officers or agents having the management of such corporation[.]" Id. The statute does not, however, include a corporation's board of directors, the individual directors, or investors in its definition of "employer." Segal, 478 Mass. at 558, citing G. L. c. 149, § 148. Thus, to impose personal liability on directors or investors under the Wage Act, "it must be because they meet one of the express categories of corporate actors identified by the Legislature: the president, treasurer, or officers or agents having the management of the
company." Segal, 478 Mass. at 558.
            It is undisputed that Reel has never been the president or treasurer of OpenRounds.. Plaintiff nonetheless argues that Reel was an "agent[ J having management of the company," and thereby subject to personal liability, because he engaged in certain operations-related activities beyond his capacity as an OpenRounds Board member. The Court does not agree.
            First, "[n]either the board of directors nor an individual director ... is, as such, an agent of the corporation." Segal, 478 Mass. at 562 (alteration in original), quoting Restatement (Second) of Agency§ 14C.[4] An agency relationship exists where "there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Id. at 562, quoting Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000). By contrast, "the board of directors, acting as a whole, is generally not subject to
another's control." Segal, 478 Mass. at 562, citing Restatement (Second) of Agency§ 14C

--------------------------------------------

[4] As the Wage Act does not define "agent", the courts"assume the Legislature intended to give the term its ordinary common and corporate law meaning." Segal, 478 Mass.at 562.

                                                            -8-

comment a. "An individual director, as such, has still less resemblance to an agent than has the board as a body. He [or she] has no power of his [or her] own to act on the corporation's behalf, but only as one of the body of directors acting as a board." Segal, 478 Mass. at 562 (alteration in original), quoting Restatement (Second) of Agency§ 14C comment b. "Even when he [or she] acts as a member of the board, he [or she] does not act as an agent, but as one of the group which supervises the activities of the corporation." Segal, 478 Mass. at 562 (alteration in original), quoting Restatement (Second) of Agency§ 14C comment b. Thus, an individual director or investor may only be considered an "agent" of the corporation if he or she has been "empowered to act as such"; for "any agency relationship stems from their appointment as an agent, not from their position as a director or investor.'' Segal, 478 Mass. at 563, citing Restatement (Second) of Agency at§ 14C comment b. These principles plainly belie the contention that Reel served as an agent of OpenRounds.
            Second, a board of directors typically does not manage the affairs of a corporation in the manner necessary to attach personal liability to its member directors under the Wage Act. As set forth above, the Wage Act imposes liability upon the «two high level officers in the corporation with individual responsibility for its over-all management, particularly its financial affairs" - viz., the president and the treasurer. Segal, 478 Mass. at 559. The Wage Act only extends personal liability beyond these two positions to those "other officers or agents who may not hold the[] titles, but who have assumed and accepted as individuals significant management responsibilities over the corporation similar to those performed by a corporate president or treasurer, particularly in regard to the control of finances or payment of wages." Id. (emphasis added). "Phrased differently, the Legislature did not  wish to allow the persons who performed the duties of the president and treasurer to be able to escape their obligations timely to pay wages under the Wage Act merely by giving themselves different titles or by avoiding any formal title."

                                                            -9-

Bisson v. Ptech, Inc., No. C.A. 02-2117, 2004 WL 2434638, at *2 (Mass. Super. Ct. Oct. 19, 2004) (Gants, J.). A board of directors "ordinarily sets policy and oversees management," but "does not perform the management function itself." Segal, 478 Mass. at 561, citing Estate of Moulton v. Puopolo, 467 Mass. 478, 487-88 (2014); Boston Athletic Ass'n v. International Marathons, Inc., 392 Mass. 356,365 (1984). As the SJC has made clear:
"The statute specifically imposes personal liability on those who have assumed individual responsibility as officers or agents [but] not ... on board members, acting as board members, or outside investors overseeing their investments. This distinction reflects the Legislature's intention to exclude the ordinary performance of board or investor responsibilities, including board or investor oversight of management and the policymaking and financial controls associated therewith, from personal liability under the Wage Act."
Segal, 478 Mass. at 565-66. Reel thus cannot be held personally liable by virtue of his Board position; so Plaintiff must instead raise as a genuine issue of fact the proposition that Reel "was
an agent of the corporation with significant management responsibilities." DaSilva v. Border Transfer of MA, Inc., 377 F. Supp. 3d 74, 98 (D. Mass. 2019), citing Segal, 478 Mass. at 567-68. She has plainly failed to do so.
            There is no evidence in the record that Reel was an agent of OpenRounds within the meaning of the Wage Act - namely, that Reel was ever subject to the control of OpenRounds, or that the Company ever expressly or impliedly empowered Reel to act on its behalf. See Segal, 478 Mass. at 562. Reel thus did not handle OpenRounds' payroll, sign checks, or possess or exercise any individual authority to bind the Company. The sole corporate officer and agent of OpenRounds, including as concerned the matter of employee compensation, was Wyeth and not Reel. These undisputed facts are inconsistent with personal liability under the Wage Act. See id. at 565, 568-69 (board members not personally liable where they lacked individual authority to bind company, did not sign checks, and were not responsible for payroll); DeMego v. Nisonson, No. 1484CV01905BLS2, 2017 WL 3090212, at *4 (Mass. Super. Ct. May 25, 2017) (Salinger,

                                                            -10-

J.) (personal liability requires defendant to "have been appointed an agent of the corporation with the power to formulate the company's financial policy"); Edwards v. Granite Techs.• LLC. No. 19-CV-12330-ADB, 2020 WL 3577911, at *4 (D. Mass. July l, 2020) (dismissing Wage Act claim where there was no allegation defendant had any policy-making responsibilities).
            The record does reflect that Reel spoke frequently with Wyeth concerning OpenRounds' business operations and strategies, and informally reviewed certain of Wyeth's planned courses of action. But there is nothing especially remarkable about an investor or board member closely monitoring the company in which he or she is substantially invested, and providing informal counsel at the request of the president and CEO. Such unexceptional facts are insufficient to trigger personal liability under the Wage Act. See Segal, 478 Mass. at 562 ("Like board members, investors invariably exercise some control over the businesses they invest in [but] exercising one's rights as an outside investor is separate and distinct from being an agent of the corporation."); Bisson, 2004 WL 2434638, at *2 (active participation of two board members "in various matters regarding the management company'' did not make them "agents having the management of such corporation" within the meaning of the Wage Act). See also In re Access Cardiosystems, Inc., 404 B.R. 593, 682 (Bankr. D. Mass. 2009), aff'd, 488 B.R. I (D. Mass. 2012)(noting that investors and board members routinely discussed company matters on an informal basis).[5]
            Significantly, there is no indication that Wyeth required Reel's approval, or that Reel controlled or directed any of the "decisions that gave rise to the allegations of illegal

--------------------------------------------

[5] Plaintiff makes much of the fact that Reel's activities exceeded the duties customarily entrusted to Board members; but the mere fact that Reel may have made distinctive contributions to the Company in his individual capacity does not perforce mean that be should be subject to personal liability for its violations of the Wage Act. See Segal. 478 Mass. at 559,565-66 (Wage Act imposes personal liability only on those individuals who have assumed significant management responsibility as officers or agents); Bisson. 2004 WL 2434638, at "2 ("If any [individual] who actively participated in a corporation's management were to fall within this determination, then every corporate vice- president and untold other officers and employees would be personally liable for their corporation's failure timely to pay wages to its employees. This Court does not believe that the Legislature intended by this language to impose personal liability on so many[.]").

                                                            -11-

compensation practices." Pineda v. Skinner Servs., Inc., No. CV 16-12217-FDS, 2020 WL 5775160, at *21 (D. Mass. Sept. 28, 2020). Our courts have declared that a defendant must '"control[], direct[], and participate[] to a substantial degree in formulating and determining policy of a corporation' [to give) rise to individual liability under the [Wage Act]." Id., quoting Segal, 478 Mass. at 561. In the case at bar, the record reflects no more than that Wyeth made ad hoc requests for Reel's input on certain business matters, and that Reel thereupon supplied personal views for consideration that Wyeth had unfettered discretion to take or leave before implementing his own decision. As to Melendez specifically, it appears that the terms of her original hire and compensation, the off er to adjust her role within OpenRounds or place her on a 60-day review plan, and the ultimate decision to terminate her employment altogether were all formulated and effectuated by Wyeth. Reel's acknowledged feedback concerning such matters was not binding on Wyeth, and did not appear to alter the substance of Wyeth's decisions in any respect. This sort of input is simply not the predicate for individual Wage Act liability the law requires. See Segal. 478 Mass. at 565 (no individual liability even where defendant had authority to fire plaintiff but did "not [have] over-all management of the financial and payroll function of the company as required by the Wage Act").
            As a final point, and an ironic one, the substance of Reel's advice to Wyeth regarding Melendez's separation from the Company was for OpenRounds to follow the Wage Act and the guidance of outside legal counsel regarding unemployment benefits, which Wyeth/OpenRounds apparently did.[6] Plaintiff has not shown how OpenRounds' alleged failure to issue her stock certificates or pay her other purportedly due wages was attributable to Reel. Put simply, no reasonable factfinder could conclude that Reel "assumed and accepted  ...  significant management responsibilities over [OpenRounds] similar to those performed by [the] president or

--------------------------------------------

[6] Plaintiff concedes that she was timely paid upon termination and, apart from the disputed stock certificates, her opposition to this motion does not clearly identify what "wages" OpenRounds allegedly still owes her.

                                                            -12-

treasurer, particularly in regard to the control of finances or payment of wages." Segal, 478 Mass. at 559. Reel is thus entitled to summary judgment on the sole remaining claim against him for violation of the Wage Act.
CONCLUSION AND ORDER
            For all the foregoing reasons, Defendant Joseph Reel's Motion for Summary Judgment is
ALLOWED.
SO ORDERED.